Lionel Z. Glancy (#134180)
Kara M. Wolke (#241521)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:      (310) 201-9150
Facsimile:      (310) 201-9160
Email:      lglancy@glancylaw.com
             kwolke@glancylaw.com

*Attorneys for Plaintiff Jake Ha*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAKE HA, derivatively and on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN E. CALDWELL, HENRY WK CHOW, BRUCE L. CLAFLIN, NORA M. DENZEL, NICHOLAS M. DONOFRIO, MARTIN L. EDELMAN, JOHN R. HARDING, JOSEPH A. HOUSEHOLDER, MICHAEL J. INGLIS, LISA T. SU AND AHMED YAHIA,<br><br>Defendants.<br><br>and<br><br>ADVANCED MICRO DEVICES, INC.<br><br>Nominal Defendant. | Case No.:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Jake Ha ("Plaintiff"), by and through his undersigned attorneys, brings this action derivatively on behalf of nominal defendant Advanced Micro Devices, Inc ("AMD" or the "Company") and alleges upon personal knowledge as to himself and his own acts, and as to all other matters based upon the investigation conducted by his attorneys which included, among other things, a review of filings with the United States' Securities and Exchange Commission ("SEC"), documents, analyst reports, news reports, press releases, and other publicly available information regarding the Company, as follows:

## INTRODUCTION

1.      This is a shareholder derivative action brought on behalf of AMD against the members of its Board of Directors ("Board") seeking to remedy defendants' breaches of fiduciary duties and other violations of the law that occurred from at least the beginning of 2011 through the present (the "Relevant Time Period"). Plaintiff's allegations concern the conduct of the Board in systematically failing to implement internal corporate controls necessary to ensure the Company disseminates accurate information to its shareholders and the broader investment community. The allegations arise out of the Company's failure to provide material information concerning a Company product called Llano. Llano utilized AMD's microprocessor 'fusion' technology which the Company assured investors permitted better microprocessor performance and was in strong demand. In fact, the opposite was true. Llano suffered from serious production difficulties and critical delays in distribution. Ultimately, AMD would write-off approximately $100 million in Llano related assets. As Llano's operational difficulties were disclosed to investors in late 2012 the trading price of AMD securities declined significantly.

2.      Of the current eleven member Board, at least seven Board members were directors or AMD executives during the period when AMD disseminated misleading information to investors concerning the ill-fated Llano product. Indeed, defendant Su served as AMD's Senior Vice President and General Manager, Global Business Units beginning in January 2012. Yet, the Board has seen fit to reward defendant Su with a promotion to the Company's Chief Executive Officer and President.

3.     The failure of the Board to implement the proper internal controls as described herein caused the Company to suffer significant harm both to its reputation and to the trading price of Company securities.  Furthermore, as a result of the Board's failure to implement necessary policies and protocols to ensure the accurate dissemination of material information the Company and certain current and former executives, including defendant Su, are the subject of a federal securities lawsuit (the "Federal Securities Lawsuit") in this Court, in which defendants are alleged to have mislead investors in relation to the Llano product.  On March 31, 2015, this Court denied the defendants in the Federal Securities Lawsuit their motion to dismiss the fraud allegations against them.

4.     Here, Plaintiff, in a derivative capacity on behalf of the Company, seeks improvements to the Company's internal policies and controls to ensure Company disclosure and accounting policies are brought up to standards acceptable for a publicly traded company and further to void a proxy vote that occurred on or about April 29, 2015 at which AMD shareholders approved the election of Board members without full disclosure of the wrongful behavior as described herein.  Plaintiff further seeks restitution of all profits obtained by defendants resulting from their wrongful conduct.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over all claims asserted herein.  The jurisdiction of the Court is pursuant to 28 U.S.C. 1331 because Plaintiff's claims arise under Section 14(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78n(a).   In addition, this Court has supplemental jurisdiction over the remaining claims alleged here pursuant to 28 U.S.C. 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

6.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in, this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of

jurisdiction by the District court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this Court under 28 U.S.C. §1391(a) because: (1) one or more defendants either resides in, or maintains executive offices in, this District; (2) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred within this District, and (3) defendants have received substantial compensation in this District by conducting business herein and by engaging in numerous activities that have had an effect in this District.

## PARTIES

### PLAINTIFF

8.     Plaintiff is a current shareholder of AMD and has been a shareholder continuously throughout the Relevant Time Period.  Plaintiff is a citizen of the state of California.

### NOMINAL DEFENDANT AMD

9.     Defendant AMD is a corporation that designs and distributes technology for high-tech appliances such as personal computers, tablets and game consoles.  The Company is active in the global semi-conductor industry.  The Company is located at One AMD Place, Sunnyvale, California, 94088.  The Company is incorporated in Delaware.  The Company's shares are traded on the NASDAQ stock exchange under the symbol "AMD".  Plaintiff believes AMD is a citizen of the states of California and Delaware.

### INDIVIDUAL DEFENDANTS

10.     Defendant John E. Caldwell ("Caldwell") serves as a director on the Board and has served on the Board since 2006.  Caldwell also serves as Chair of the Board's Compensation Committee and the on the Board's Nominating and Corporate Governance Committee.  Plaintiff believes Caldwell is a citizen of Canada.

11.     Defendant Henry WK Chow ("Chow") serves as a director on the Board and has served on the Board since 2011.  Chow also serves as a member of the Board's Audit and

Financing Committee and the Nominating & Corporate Governance Committee.   Plaintiff believes Chow is a citizen of the People's Republic of China.

12.     Defendant Bruce L. Claflin ("Claflin") serves as a director on the Board and has served on the Board since 2003.   Claflin also serves as Chair of the Board's Nominating & Corporate Governance Committee.  Plaintiff believes Claflin is a citizen of Maine.

13.     Defendant Nora M. Denzel ("Denzel") serves as a director on the Board and has served on the Board since 2014.  Denzel also serves on the Board's Nominating & Corporate Governance Committee.  Plaintiff believes Denzel is a citizen of California.

14.     Defendant Nicholas M. Donofrio ("Donofrio") serves as a director on the Board and has served on the Board since 2009.  Donofrio also serves as Chair of the Board's Innovation and Technology Committee and as a member of the Board's Compensation Committee and the Board's Nominating & Corporate Governance Committee.   Plaintiff believes Donofrio is a citizen of Connecticut.

15.     Defendant Martin L. Edelman ("Edelman") serves as a director on the Board and has served on the Board since 2013.  Plaintiff believes Edelman is a citizen of New York.

16.     Defendant John R. Harding ("Harding") serves as a director on the Board and has served on the Board since 2012.  Harding also serves as a member on the Board's Innovation and Technology Committee.  Plaintiff believes Harding is a citizen of Vermont.

17.     Defendant Joseph A. Householder ("Householder") serves as a director on the Board and has served on the Board since 2014.  Householder also serves as Chair of the Board's Audit and Finance Committee and as a member of Board's Nominating & Corporate Governance Committee.  Plaintiff believes Householder is a citizen of California.

18.     Defendant Michael J. Inglis ("Inglis") serves as a director on the Board and has served on the Board since 2014.  Inglis also serves as a member of the Board's Audit and Finance, Innovation and Technology, and Nominating & Corporate Governance Committees. Plaintiff believes Inglis is a citizen of the United Kingdom.

19.     Defendant Lisa T. Su ("Su") serves as a director on the Board and has served on the Board since 2014. Su further serves as the Company's President and Chief Executive Officer ("CEO"). Plaintiff believes Su is a citizen of Texas. Su served as the Company's Chief Operating Officer from July 2014 until October 2014 and as AMD's Senior Vice President and General Manager, Global Business Units beginning in January 2012.

20.     Defendant Ahmed Yahia ("Yahia") serves as a director on the Board and has served on the Board since 2012. Yahia also serves as a member on the Board's Innovation and Technology Committee. Plaintiff believes Yahia is a citizen of the United Arab Emirates.

21.     The Defendants identified above in paragraphs 10 through 20 are collectively referred to herein as the Individual Defendants.

22.     The Individual Defendants, by reasons of their status as directors on the Board, members of the Board's committees, and / or their executive positions within AMD have, and at all relevant times have had, access to internal corporate documents, conversations and meetings within AMD. Therefore, the Individual Defendants know, and at all relevant times have known non-public information about AMD, its finances, business operations, and internal controls.

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

23.     By reason of their positions as officers and directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe, and at all relevant times owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interests or benefit.

24.     Each director and officer of the Company owes to AMD and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations

1  of fair dealing.  In addition, as officers and directors of a publicly held company, the Individual

2  Defendants have a duty to ensure the Company establishes proper internal controls so that the

3  Company disseminates accurate and truthful information with regard to the Company's revenue,

4  margins, operations, performance, management, projections and forecasts so that the market

5  price of the Company's stock is based on truthful and accurate information.

6       25.    The Individual Defendants, because of their positions of control and authority as

7  directors and/or officers of AMD, were able to and did, directly and/or indirectly, exercise

8  control over the wrongful acts complained of herein.

9       26.    At all times relevant hereto, each of the Individual Defendants was the agent of

10 the other Individual Defendants and of AMD, and was at all times acting within the course and

11 scope of such agency.

12      27.    To discharge their duties, the officers and directors of AMD were required to

13 exercise reasonable and prudent supervision over the management, policies, practices and

14 controls of the Company.  By virtue of such duties, the officers and directors of AMD were

15 required to, among other things:

16      a.    manage, conduct, supervise and direct the business affairs of AMD in accordance

17 with all applicable laws;

18      b.    neither violate nor knowingly permit any officer, director or employee of AMD to

19 violate applicable laws, rules and regulations;

20      c.    establish and maintain systematic and accurate records and reports of the business

21 and affairs of AMD;

22      d.    neither engage in self-dealing nor knowingly permit any officer, director or

23 employee of AMD to engage in self-dealing;

24      e.    ensure that the Company complied with its legal obligations and requirements;

25      f.    conduct the affairs of the Company in an efficient, business-like manner, to avoid

26 wasting the Company's assets, and to maximize the value of the Company's stock to the

27 Company's shareholders;

28

g.      ensure that the Company maintains an adequate system of financial controls such that the Company's financial reporting is true and accurate at all times; and

h.      remain informed of how AMD conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

28.      Each of the Individual Defendants, by virtue of his or her position as a director and officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants alleged herein involves violations of their obligations as directors and officers of AMD, the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders by failing to address the lack of internal controls that has led to the trading price of the Company's securities significantly decreasing and the Company being the subject of class action litigation alleging violations of federal securities laws.

AMD's Corporate Governance Documents

29.      The Company purports to conduct its business within a set of Principles of Corporate Governance (the "Principles").  The Company's webpage states the following:

> AMD's Board of Directors is responsible for selecting the Chief Executive Officer of the Company, monitoring the operating performance and financial condition of the Company, and overseeing the Company's adherence to corporate standards.

30.      The Company's webpage further provides a link to the Company's Principles, which state, in pertinent part:

**9. Ethics and Conflicts of Interest**

> Each Director commits to act ethically at all times, and in compliance with the Company's Worldwide Standards of Business Conduct. The Board will not permit the waiver of any ethical policy for any Director or company Officer. Board member conflicts of interest must be disclosed immediately to the Chairman of the Board the Chief Executive Officer (if

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the office is    separate from the Chairman), and the Lead Director (if a Lead Director has    been appointed).

31.    In addition to the Principles, AMD purports to ensure its executives and senior finance executives adhere to a Code of Ethics (the "Code").  The Code states, in pertinent part:

> This Code of Ethics ("Code") supports the commitment of the executive officers and senior finance executives of Advanced Micro Devices, Inc. ("AMD") and its related entities (collectively, the "Company") set forth on Schedule 1 attached hereto (collectively, the "Executives") to the highest ethical standards and compliance with laws, regulations and Company policies applicable to corporate financial transactions, reporting and disclosure. The Executives hold an important and elevated role in corporate governance – they are vested with responsibility to protect, balance and preserve the interests of the Company's stakeholders, including shareholders, customers, creditors, suppliers and employees, as well as citizens of the communities in which the Company does business. The Executives fulfill this responsibility, in part, by prescribing and enforcing appropriate policies and procedures for the Company's Finance Organization and by enforcing and adhering to the principles set forth in this Code. In addition to complying with this Code, the Executives, like all Company employees, must also conduct Company business in accordance with the principles set forth in AMD's Worldwide Standards of Business Conduct.

> **Business and Accounting and Financial Reporting Principles**
> The Executives will maintain Company transaction and reporting systems and procedures to ensure:
>
> • The Company adheres to the legal business and accounting practice requirements of each country and location in which it conducts business.
> • No undisclosed or unrecorded Company fund or asset is established for any purpose.
> • The Company's books and records contain no false or misleading entries.
> • No payment is made on the Company's behalf without adequate support documentation or for any purpose other than as described in the documents.
> • Business transactions are properly authorized and completely and accurately recorded in accordance with Generally Accepted Accounting Principles (GAAP) and pertinent Company policies.
> • Adherence to financial reporting requirements set forth in the laws and regulations that govern the Company's business. In this regard, Executives will ensure that accurate financial statements and disclosures of Company operations, financial conditions and cash flows are prepared, and that periodic financial reports are filed in a timely manner and in a manner that facilitates the highest degree of clarity of content and meaning.
> • Preparation of documents, as may be required, certifying the appropriateness and accuracy of the statements and disclosures in periodic Company financial reports.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

• Disclosure on a timely basis, as may be required, of all material transactions and relationships that may have a material current or future effect on the Company's business, financial condition and/or results of operations.

32.     Furthermore, and as alluded to above, the Company purports to conduct its business pursuant to a set of Worldwide Standards of Business Conduct (the "WSBC").  Leading the WSBC is an open letter written by defendant Su making clear the Company is supposed to be managed legally, ethically and with integrity and transparency.  The WSBC states, in pertinent part:

> As such, our Worldwide Standards of Business Conduct detail our commitment to conduct business legally, ethically and with integrity and transparency. Our Standards are a pledge that we make as individuals and as a corporation to do the right thing in every business situation. They provide clear guidance on critical issues and simply put, are the backbone of our business.
>
> Our focus is on (1) Building Great Products, (2) Driving Deep Customer Relationships and (3) Simplifying the Business. We are committed to doing this and living by our Worldwide Standards of Business Conduct. Doing the right thing is vital for AMD's growth and success. We are excited about our future and the great things we will accomplish.
>
> Dr. Lisa Su
> AMD President and Chief Executive Officer
>
> * * *
>
> While the Standards frequently make reference to employees, they also apply to members of the Company's Board of Directors and to third parties who perform work for or on behalf of AMD. All have a responsibility to understand and follow these Standards, and perform their work with honesty and integrity, including in areas not specifically addressed by the Standards.
>
> Following the Standards is a must. In the event an employee, Board member, or other worker violates these Standards or related Company policies and procedures, or any of the laws and regulations that govern our business, or fails to cooperate or be honest with the Company in connection with an investigation, the Company will take immediate and appropriate action, up to and including termination of employment or services.
>
> **Responsibilities of all employees and those providing services to AMD:**
> In line with our commitment to compliance and ethics, remember YOU are the key. Integrity is everyone's responsibility. In this regard, you are responsible for:
>
> • Obeying the applicable laws and regulations governing our business conduct.
> • Being honest, fair and trustworthy in your AMD activities and relationships.

• Keeping confidential, safeguarding, and properly using all information entrusted to you by AMD or our customers or by third parties with whom we do business.

• Fostering an atmosphere in which equal opportunity extends to every member of the AMD community.

• Maintaining confidentiality of and not misusing Company "insider" information.

• Avoiding situations where personal interests are or appear to be in conflict with the Company's interests.

• Protecting the environment and creating a safe workplace.

• Keeping accurate records.

• Learning the details of the policies connected with your work. While you may not know those policies word for word, you need to have a basic understanding of issues covered by each policy, and you should have a more detailed understanding of policies that apply most directly to your job.

• Applying the AMD Way to all business decisions.

• Using common sense: if you would not be comfortable having your conduct described in the media, then DON'T DO IT.

• Promptly reporting: if you have any concerns about possible illegal or unethical behavior, including any violations of these Standards, or if you have any concerns about a possible request or suggestion to violate an AMD policy or any applicable law or regulation.

* * *

**2. Business, Financial and Accounting Practices**

Company employees and agents are required to adhere to the business, financial reporting, and accounting practice requirements of the Company and the laws in each country in which the Company conducts business, and shall employ the highest ethical standards. No undisclosed or unrecorded Company fund or asset shall be established for any purpose, and no false or misleading entries shall be made in the Company's books or records. No payment on behalf of the Company shall be made without adequate support documentation or for any purpose other than as described in the documents. Employees shall comply with United States generally accepted accounting rules, unique accounting requirements for certain public sector end-users, local statutory reporting regulations and the Company's internal control policies as established in their respective locations.

Appropriate personnel shall prepare accurate financial statements and disclosures of the Company. Such periodic reports shall be filed in a timely manner in accordance with the applicable laws and regulations and in compliance with the Company's internal control processes. As required, employees must also prepare statements certifying the effectiveness of the Company's internal control processes over financial reporting and the appropriateness and accuracy of the financial statements and disclosures. In addition, appropriate personnel shall fulfill all disclosure requirements regarding material transactions and relationships that may have a material current or future effect on the Company's financial condition.

1  In the unlikely event that the Company determines that it is required to prepare
2  an accounting restatement due to material noncompliance with any financial reporting
3  laws applicable to the Company and that it is required to recover from you any
   incentive-based or other compensation (including any equity awards) paid or granted to
4  you, the Company may pursue all remedies available to or required of it under law,
   including recovery of any such compensation.

5  33.  The Principles, the Code and the WSBC are hereinafter referred to collectively as

6  the "AMD Corporate Governance Documents". The AMD Corporate Governance Documents

7  make clear that either the Individual Directors know or should know that AMD is required to

8  implement internal corporate controls to ensure the Company and its agents act ethically in

9  conducting Company business. The conduct complained of here, including the failure of the

10 Board to ensure accurate information was disseminated to the Company's shareholders and to

11 communicate that failure to AMD's shareholders ahead of shareholder votes to elect Board

12 members, demonstrates the failure of the Board to ensure proper internal controls have been

13 established at the Company.

14 **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

15 34.  In committing the wrongful acts alleged herein, the Individual Defendants have

16 pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with,

17 and conspired with one another in furtherance of their common plan or design. In addition to the

18 wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants

19 further aided and abetted and/or assisted each other in breach of their respective duties.

20 35.  During all times relevant hereto, the Individual Defendants collectively and

21 individually initiated a course of conduct that was designed to and did:

22   (a) Fail to implement and maintain adequate internal controls so as to properly
23   inform the Company's shareholders about the Company's operations, including ahead
     of shareholder votes to elect Board members;

24
25   (b)  Fail to implement and maintain adequate internal controls to ensure
     Board members acted in the interests of the Company's shareholders; and

26   (c) Maintain the Individual Defendants' executive and directorial positions at
27   AMD and the profits, power and prestige that the Individual Defendants enjoy as a
     result of these positions.

28

36.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing and substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### SUBSTANTIVE ALLEGATIONS

COMPANY BACKGROUND

37.     According to AMD's latest annual report filed with the SEC on or about February 19, 2015 (the "2015 Annual Report"), the Company is a global semiconductor company offering primarily two products within the semiconductor industry; (1)'x86 microprocessors', used as standalone devices or incorporated as an accelerated processing unit ("APU"), chipsets, discrete graphics processing units ("GPUs") and professional graphics; and (2) server and embedded processors, dense servers, semi-custom System-on-Chip ("SoC") products and technology for game consoles.

38.     Semiconductors are components used in a variety of electronic products and systems.   An integrated circuit ("IC") is a semiconductor device that consists of many interconnected transistors on a single chip.  According to the 2015 Annual Report, since the invention of the transistor in 1948, improvements in IC process and design technologies have led to the development of smaller, more complex and more reliable ICs at a lower cost-per-function. The 2015 Annual Report states that a microprocessor is an IC that serves as the central processing unit ("CPU") of a computer, generally consisting of hundreds of millions or billions of transistors that process data and control other devices in the system, acting as the "brain" of the computer.

39.     The 2015 Annual Report states that the performance of a microprocessor is a critical factor impacting the performance of computing and entertainment platforms, such as desktop PCs, notebooks, tablets and workstations.  The principal elements used to measure CPU

1   performance are work-per-cycle (or how many instructions are executed per cycle), clock speed

2   (representing the rate at which a CPU's internal logic operates, measured in units of gigahertz, or

3   billions of cycles per second) and power consumption.  Other factors impacting microprocessor

4   performances include the number and type of cores in a microprocessor, the bit rating of the

5   microprocessor, memory size and data access speed.

6        40.    The 2015 Annual Report further provides information concerning Accelerated

7   Processing Units, or "APU's" and SoC.  The 2015 Annual Report states that "[c]onsumers

8   increasingly demand computing devices, including desktop and notebooks PCs, and smaller form

9   factors, such as tablets and 2-in-1s (PCs that can function both as a notebook or a tablet), with

10  improved end-user experience, system performance and energy efficiency.  Consumers also

11  continue to demand thinner and lighter mobile devices, with better performance and longer

12  battery life."  The 2015 Annual Report states that an APU is a processing unit that integrates a

13  CPU and a GPU onto one chip (or one piece of silicon), along with, in some cases, other special-

14  purpose components.  This integration enhances system performance by "offloading" selected

15  tasks to the best-suited component (i.e., the CPU or the GPU) to optimize component use,

16  increasing the speed of data flow between the CPU and GPU through shared memory and

17  allowing the GPU to function as both a graphics engine and an application accelerator. Having

18  the CPU and GPU on the same chip also typically improves energy efficiency by, for example,

19  eliminating connections between discrete chips.

20       41.    The 2015 Annual Report also provides information concerning the Company's

21  marketing and sales strategies, stating that the Company sells its products both through a direct

22  sales force and through third-party, independent distributors and sales representatives in both

23  domestic and international markets.   The Company refers to its independent distribution

24  procedure as 'channel' distributors.  The Company purports to operate its sales on the basis of

25  "product forecasts" provided by the particular customer.

26       42.    The 2015 Annual Report further provides information concerning the

27  competitiveness of the IC industry, which is described as "intensely competitive".  Products are

28

described as competing on "timely product introductions, product quality (including enabling state-of-the art visual experiences), power consumption (including battery life), reliability, processor clock speed, performance, size (or form factor), selling, price, cost, adherence to industry standards (and the creation of open industry standards), level of integration, software and hardware compatibility and stability, brand recognition and availability.

43.     Further, the 2015 Annual Report states that technological advances in the microprocessor industry result in "frequent product introductions, regular price reductions and short product life cycles for some products, and increased product capabilities that may result in significant performance improvements."

THE DISSEMINATION OF INFORMATION TO THE INVESTMENT COMMUNITY

44.     As expected from a publicly traded company, AMD periodically issues press releases and submits filings with the SEC purporting to detail the Company's business and finances.  The Company is required by its own AMD Corporate Governance Documents in addition to various third-party rules and regulations (both private and governmental) to ensure that the information in such press releases and SEC filings is accurate.  It is the responsibility of the Board to ensure the Company has the necessary policies and protocols to ensure the Company complies with its reporting responsibilities.

AMD PUBLICLY LAUDS THE PERFORMANCE AND PROSPECTS OF ITS LLANO PRODUCT

45.     During the Relevant Time Period, AMD publicly lauded the performance and prospects of its Llano product.  Llano was touted as a "next generation" product enabling "supercomputer-like performance" and long battery life, and was even described by the Company in a June 2011 press release as "perhaps the industry's biggest architectural change since the invention of the microprocessor".  Llano reflected 'fusion' technology.  The Company gave in its 2012 Annual Report the following description of the technology behind Llano, stating, in pertinent part:

Our AMD Fusion Accelerated Processing Unit, or APU, combines our CPU and GPU onto a single piece of silicon. We believe that high performance computing workloads, workloads that are visual in nature and even traditional applications such as photo and video editing or other multi-media applications can benefit from our accelerated computing architecture.

46.     The June 2011 press release stated in pertinent part:

*SUNNYVALE, Calif. 6/14/2011*

AMD (NYSE: AMD) today announced the next generation in mainstream consumer computing with the availability of the new high-performance AMD Fusion A-Series Accelerated Processing Units (APUs). Enabling truly immersive computing experiences in consumer notebooks and desktops, the AMD A-Series APUs enable brilliant HD graphics, supercomputer-like performance and over 10.5 hours of battery life2.

In an increasingly digital and visually oriented world, consumers are placing ever-higher priorities on multitasking, vivid graphics, lifelike games, lag-free videos, and ultimate multimedia performance. To meet these needs, the AMD A-Series APUs combine up to four x86 CPU cores with powerful DirectX®11-capable discrete-level graphics and up to 400 Radeon™ cores along with dedicated HD video processing on a single chip. AMD A-Series APUs also allow for advanced capabilities such as gestural interfaces, multi-monitor support, 3D entertainment and real-time image stabilization3.

"The AMD A-Series APU represents an inflection point for AMD and is perhaps the industry's biggest architectural change since the invention of the microprocessor," said Rick Bergman, senior vice president and general manager, AMD Products Group. "It heralds the arrival of brilliant all-new computing experiences, and enables unprecedented graphics and video performance in notebooks and PCs. Beginning today we are bringing discrete-class graphics to the mainstream."

The AMD A-Series APUs (previously codenamed "Llano") are currently shipping and scheduled to appear in more than 150 notebooks and desktops4 from leading OEMs throughout the second quarter of 2011 and beyond. Delivering powerful serial and parallel computing capabilities for HD video, 3D rendering and data-intensive workloads in a single-die processor, the AMD A-Series APUs offer software developers unprecedented power and potential in an ever smaller package.

47.     Similarly, the Company's annual report filed on February 24, 2012 (the "2012 Annual Report") also highlighted the importance of Llano to the Company, stating in pertinent part:

**Overview**

In 2011, we experienced important changes in our business. First, we continued to develop and deliver differentiated products. We launched our AMD family of APU products and experienced strong customer demand, especially for our AMD E-Series and C-Series APUs designed for low-power desktop and mobile platforms, codenamed

"Brazos," and our AMD A-Series APUs, codenamed "Llano," for mainstream desktop and mobile platforms. We introduced a number of competitive graphics products in 2011. In July 2011, we launched the AMD Radeon™ HD 6990M graphics processor designed for enthusiast mobile gamers. We also launched the AMD Radeon HD 7970 graphics processor in December 2011, our first graphics processor based on 28nm process technology and AMD's Graphic Core Next Technology. We also continued to focus on improving our competitive position in the server market and believe we regained momentum in the second half of 2011 with the introduction of our new multi-core AMD Opteron™ 6200 and 4200 series processors, which are based on our "Bulldozer" x86 architecture.

48.     Throughout the Relevant Time Period, AMD repeatedly touted both the positive impact of the Llano product to the Company and the anticipated benefits of Llano to AMD.  For example, on April 21, 2011 the Company filed with the SEC a Form 8-K containing a press release highlighting purported demand for its Llano product.  The April 21, 2011 press release stated in pertinent part:

**SUNNYVALE, Calif. – Apr. 21, 2011** – AMD (NYSE:AMD) today announced revenue for the first quarter of 2011 of $1.61 billion, net income of $510 million, or $0.68 per share, and operating income of $54 million. The company reported non-GAAP net income of $56 million, or $0.08 per share, and non-GAAP operating income of $92 million.

"First quarter operating results were highlighted by strong demand for our first generation of AMD Fusion Accelerated Processing Units (APUs)," said Thomas Seifert, CFO and interim CEO. "APU unit shipments greatly exceeded our expectations, and we are excited to build on that momentum now that we are shipping our 'Llano' APU."

…

Computing Solutions segment revenue decreased 2 percent sequentially and increased 3 percent year-over-year. The sequential decrease was driven primarily by lower average selling price (ASP) partially offset by higher desktop microprocessor sales. The year-over-year increase was primarily driven by strong microprocessor unit sales in the channel.

…

AMD commenced revenue shipments of AMD's first Fusion APU for mainstream notebooks (codenamed "Llano") that combines discrete-class graphics capabilities, personal supercomputing performance and AMD AllDay™ power.

49.     Attached to the April 21, 2011 Form 8-K was a 'CFO Commentary' which also purported to inform investors about the successes of the Llano product, stating in pertinent part:

**Q1 2011 Segment Results – Computing Solutions**

**Computing Solutions segment revenue** was $1.2 billion, down 2% compared to the fourth quarter of 2010, primarily due to:

- lower server and notebook microprocessor sales driven by ASP declines, partially offset by higher desktop microprocessor sales

- weak demand in mature markets partially offset by moderate growth in demand in emerging economies

APU platforms are gaining traction in the market as evidenced by a faster than anticipated ramp as unit shipments tripled over the prior quarter. Adding to this momentum, we started shipping Llano, our high-end APU, late in the first quarter of 2011.

50.     In fact, the touted success of Llano, as described above, was false and misleading because the Company was experiencing significant operational problems with Llano, related in part to the production of silicon chips.  Further, the limited life-cycle of microprocessor products meant that the operational difficulties described above and the accompanying delays in distribution would lead to limited demand for the Llano product so much so that AMD would delay distribution through its third-party 'channels' and favor instead direct distribution to customers.

51.     The silicon chips necessary for the production of Llano had been beset by production difficulties leading to the delayed launch of the product.  In July 2010, Dirk Meyer ("Meyer") AMD's then Chief Executive Officer stated the delayed roll-out of Llano was due to difficulties with the nanometers supporting the Llano products.  Meyer stated, in pertinent part:

Customer systems based on Ontario are planned to be available early next year. Llano our Fusion APU offering aimed at the higher end of the client market is also generating positive customer response. However, in reaction to Ontario's market opportunities and a slower than anticipated progress of 32 nm yield curve, we are switching the timing of the Ontario and Llano production ramps.

Llano production shipments are still expected to occur in the first half of next year. In the second quarter this year we also taped out the first 32 nm product based on our new high performance Bulldozer CPU core. We plan to begin sampling our

Bulldozer based server and desktop processors in the second half of this year and remain on track for 2011 launches. These new processors will deliver significant performance improvements to the AMD platform."

52.     Market analysts reported on the delayed Llano launch.   Xbit Laboratories published an on-line article on July 16, 2010 describing how the operational difficulties with Llano involved a lower than anticipated 'yield' associated with the underlying 32 nanometer technology.  The Xbit Laboratories article stated, in pertinent part:

> Earlier it was expected that AMD will start to ship its Llano accelerated processing units (APUs) for revenue already in Q4 2010 with official product launch taking place sometime very early in 2011. It is not clear whether AMD has problems wedding the Llano design to the 32nm SOI fabrication process, there are issues with the process itself or the design of the Llano has certain flaws. In any case, the start of commercial shipments slipped by two months, according to AMD.

> "We have seen the rate of yield leaning below our plans on 32nm. [...] We take a bit more time to work on the 32nm yields up the curve. So, the effective change [...] to our internal plans on Llano amounts to a couple of months," said Mr. Meyer.

53.     Nevertheless, AMD assured investors that operational problems related to Llano and production yields were resolved and the Company continued to tout the operational success of Llano.  For example, in an April 4, 2011 conference call with analysts, Thomas J, Seifert, ("Seifert") AMD's former Chief Financial Officer and former interim Chief Executive Officer, stated that the 32 nanometer yields were in line with the Company's expectations, were on target and that issues associated with the 32 nanometer yields were behind the Company.

54.     On July 21, 2011, the Company filed with the SEC a Form 8-K including a press release announcing the Company's Second Quarter 2011 financial results.  The July 21, 2011 press release stated, in pertinent part:

**AMD Reports Second Quarter Results**

…

> Accelerating Fusion Accelerated Processor Unit (APU) shipments drive record microprocessor unit shipments and record mobile microprocessor unit shipments

> **SUNNYVALE, Calif. – July 21, 2011** – AMD (NYSE:AMD) today announced revenue for the second quarter of 2011 of $1.57 billion, net income of $61 million, or $0.08 per share, and operating income of $105 million. The company reported non-

GAAP net income of $70 million, or $0.09 per share, and non-GAAP operating income of $114 million.

"In the first half of 2011, AMD brought to market the most competitive client offerings in our history, reinforcing our position as a design and innovation powerhouse," said Thomas Seifert, CFO and Interim CEO. "Today's computing experience is increasingly being defined by the ability to deliver brilliant multimedia and video content with all day battery life. Fusion APUs are ideal to meet this need, positioning AMD to gain unit market share in the mobile computing space."

55.    Attached to the July 2011 Form 8-K was a 'CFO Commentary', in which the Company again touted the operational success of Llano and the significance of Llano to the Company's overall performance, stating, in pertinent part:

### Q2 2011 Segment Results – Computing Solutions

**Computing Solutions segment revenue** was $1.2 billion, flat compared to the prior quarter as higher mobile processor revenue was offset by lower server and desktop microprocessor revenue.

- In a seasonally down quarter, AMD's successful regional assortment helped offset seasonal trends as we capitalize on growth with key strategic OEMs, while making progress in key growth areas such as China and Latin America.

- record mobile processor unit shipments were driven by continued strength of the APU platform, now representing over 70% of total mobile platform unit shipments and revenue in the quarter. We shipped over 1 million Llano APUs in the quarter and nearly 6 million Brazos APUs.

- APU platforms now represent over 40% of client units shipped, underlining strong APU adoption and reflecting the beginning of a shift in the computing industry from legacy microprocessors to a revolutionary APU architecture.

APUs have opened up significant opportunities within our customer base,

- the AMD E-series Fusion APU-based Lenovo x120e was one of the top selling commercial notebooks among distributors targeting small and medium businesses and exceeding demand forecasts.

- we continue to grow our commercial footprint as AMD-based offerings are sold to large financial institutions.

- we saw a 50% year-over-year increase in notebook designs from our top OEM partners.

**Computing Solutions operating income** was $142 million, up $42 million from the previous quarter, primarily due to improved gross margins from a richer mix of APU sales compared to the prior quarter.

…

**Outlook**

The following statements concerning AMD are forward-looking, and actual results could differ materially from current expectations.

Q3 2011:

AMD expects revenue to increase 10 percent, plus or minus 2 percent, sequentially for the third quarter of 2011.

Operating expenses are expected to be approximately $625 million.

AMD has reached an inflection point with its APU strategy as evidenced by the success of APU offerings. As the Llano APU penetration continues, we expect to increasingly participate in mainstream and performance notebook market segments. We believe this opportunity positions AMD to achieve higher client ASP and gross margin, and increase our mobile microprocessor unit market share in the second half of 2011.

We expect APU shipments to exceed two-thirds of AMD's client unit shipments in the third quarter, representing nearly 100% of our mobile platform shipments.

Our new Bulldozer core for servers is expected to ship in the third quarter, and we believe will strengthen our competitive position in servers, setting the stage for unit market share recovery, as Interlagos-based platforms roll out throughout the second half of this year.

56.     Similarly, on August 10, 2011, the Company filed with the SEC a Form 10-Q purporting to announce the Company's financial results for the six months ended July 2, 2011, and in which the Company again reported on its APU and Llano products.  The August 10, 2011 Form-10Q stated, in pertinent part:

During the second quarter of 2011, we continued to experience strong customer demand for our AMD Fusion family of accelerated processing unit (APU) products. In addition to increased sales of AMD Fusion C-Series and E-Series APUs, codenamed "Brazos," our first APU platform product for mobile devices, we ramped shipments of AMD Fusion A-Series APUs, codenamed "Llano," for desktop and mobile devices during the second quarter of 2011. Llano APUs that are used in platforms for mobile devices are codenamed "Sabine," and Llano APUs that are used in platforms for desktop PCs are codenamed "Lynx." As a result of strong customer adoption of the Brazos and Llano-based platforms during the second quarter of 2011, we achieved record mobile processor unit shipments and record overall microprocessor unit shipments, and AMD Fusion APU unit shipments represented over 70% of total unit

shipments of microprocessors for mobile devices. The demand for Llano-based platforms by our customers exceeded the supply in the second quarter of 2011. Increased unit shipments of our APU products contributed to a richer mix of microprocessors for mobile devices, which were accretive to our second quarter 2011 gross margin. Also in May 2011, we launched an embedded AMD Fusion G-Series APU designed for compact, fanless embedded systems such as digital signage, kiosks and mobile industrial devices. In June 2011, we launched our first HD tablet platform based on the AMD Fusion Z-Series APU. With respect to graphics products, we strengthened our product portfolio with the launch of our AMD Radeon HD 6990 GPU, designed for enthusiast mobile gamers. We also launched our newest generation of professional graphics cards – AMD FirePro V5900 and AMD FirePro V7900, which are designed to allow users to open more applications and view more information at the same time. Also, Nintendo™ announced during the second quarter of 2011 that we had been selected to provide the graphics processor for Nintendo's next generation game console system.

57.     Attached to the August 10, 2011 Form 10-Q was a signed 'certification' from Seifert pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, in which Seifert stated, in broad terms, that based on his knowledge the accompanying financial report did not contain any untrue statement of material fact or omit to state a material fact, and that the financial information in the report fairly represented the financial condition and results of operations of the Company.   The certification further stated, again in broad terms, that the Company had the necessary internal controls to ensure that financial statements made therein were reliable.

AMD BEGINS TO DISCLOSE OPERATIONAL DIFFICULTIES WITH LLANO BUT NEVERTHELESS MAINTAINS DEMAND FOR THE PRODUCT REMAINS STRONG

58.     On September 28, 2011, the Company again disseminated information to investors concerning Llano, including the suggestion that there was "strong demand" for AMD products.   Nevertheless, in the September 28, 2011 press release, the Company also revealed that 'manufacturing', 'yield' and 'ramp' issues at a German factory had limited the supply of Llano. The German factory was identified as "GLOBALFOUNDRIES", located in Dresden ("GF").   GF was formed by AMD in 2009.   According to the Company's 2012 Annual Report, GF was formed as a joint venture to manufacture products and provide foundry services to AMD. Included in the agreement between AMD and GF was a clause for GF to provide 'wafers' for the

Company's microprocessors, including the Company's APU products and including 45nm and 32nm wafers. The Company 2012 Annual Report stated, in pertinent part:

> ***GLOBALFOUNDRIES, Inc.*** On March 2, 2009, together with Advanced Technology Investment Company LLC (ATIC) and West Coast Hitech L.P., (WCH), acting through its general partner, West Coast Hitech G.P., Ltd., we formed GLOBALFOUNDRIES, Inc. (GF), a manufacturing joint venture that manufactures semiconductor products and provides certain foundry services to us.
>
> Wafer Supply Agreement. At the closing of the transactions, we entered into a Wafer Supply Agreement (WSA), which governs the terms by which we purchase products manufactured by GF. Pursuant to the WSA, we are required to purchase all of our microprocessor unit and APU product requirements from GF with limited exceptions. On April 2, 2011, we amended the WSA. The primary effect of the amendment was to change the pricing methodology applicable to wafers delivered in 2011 for our microprocessors, including APU products. The amendment also modified our existing commitments regarding the production of certain GPU and chipset products at GF. Pursuant to the amendment, GF committed to provide us with, and we committed to purchase, a fixed number of 45nm and 32nm wafers per quarter in 2011. We paid GF a fixed price for 45nm wafers delivered in 2011. Our price for 32nm wafers varied based on the wafer volumes and manufacturing yield of such wafers and was based on good die. In addition, we also agreed to pay an additional quarterly amount to GF during 2012 totaling up to $430 million if GF met specified conditions related to continued availability of 32nm capacity as of the beginning of 2012. Under the current terms of the WSA, in 2012, we will compensate GF on a cost plus basis for projected manufacturing capacity that we have requested for our microprocessors, including our APU products. However, we are currently in the process of negotiating a second amendment to the WSA, including the pricing methodology. If we do not successfully conclude our negotiations, it could have a material adverse impact on our gross margins and our results of operations.
>
> The WSA terminates no later than March 2, 2024. GF has agreed to use commercially reasonable efforts to assist us to transition the supply of products to another provider, and to continue to fulfill purchase orders for up to two years following the termination or expiration of the WSA. During the transition period, pricing for microprocessor products will remain as set forth in the WSA, but our purchase commitments to GF will no longer apply.
>
> GF manufactures our microprocessors on 300 millimeter wafers using primarily 45nm and 32nm process technology.

59.     The September 28, 2011 press release stated, in pertinent part:

*SUNNYVALE, Calif. 9/28/2011*

AMD (NYSE:AMD) today announced that revenue for the third quarter ending Oct. 1, 2011 is expected to increase four to six percent as compared to the second quarter of 2011. The company previously forecasted third quarter 2011 revenue to increase 10 percent, plus or minus two percent, from the second quarter of 2011.

In addition, AMD expects third quarter gross margin to be approximately 44 to 45 percent. The company previously forecasted third quarter 2011 gross margin to be approximately 47 percent.

The less-than-forecasted preliminary third quarter 2011 revenue results are primarily due to 32 nanometer (nm) yield, ramp and manufacturing issues at GLOBALFOUNDRIES in its Dresden, Germany factory that limited supply of "Llano". Additionally, 45nm supply was less than expected due to complexities related to the use of common tools across both technology nodes. AMD continues to work closely with its key partner GLOBALFOUNDRIES to improve 32nm yield performance in order to satisfy strong demand for AMD products.

The less-than-forecasted preliminary third quarter 2011 gross margin results are primarily due to less-than-expected supply of "Llano" and associated products with higher average selling price (ASP). Additionally, shipments of AMD's next-generation server processor, codenamed "Interlagos", occurred later in the third quarter than originally anticipated.

60.   In other words, the yield problems associated with the 32 nanometer production had not been resolved, as AMD had previously stated, yet nevertheless, AMD continued to tout Llanos and although the September 29, 2011 press release contained negative information about production problems associated with the Llano product, the press release omitted to inform investors about the extent of operational difficulties associated with Llano.

61.   As a result of the information disseminated in the September 28, 2011 press release, the trading price of AMD securities fell significantly, from a high of $6.57 per share on September 28, 2011 to a low of $5.11 per share the following day, on very heavy volume.

62.   On or about October 27, 2011 the Company filed with the SEC a Form-8K containing a press release reporting the Company's third quarter 2011 financial results.  As before, the Company took pains to emphasize the success of its APU business, claiming it was driving up microprocessor revenue.  The October 27, 2011 press release stated, in pertinent part:

**SUNNYVALE, Calif. – Oct. 27, 2011** – AMD (NYSE:AMD) today announced revenue for the third quarter of 2011 of $1.69 billion, net income of $97 million, or $0.13 per share, and operating income of $138 million. The company reported non-GAAP net income of $110 million, or $0.15 per share, and non-GAAP operating income of $146 million.

"Strong adoption of AMD APUs drove a 35 percent sequential revenue increase in our mobile business," said Rory Read, AMD president and CEO. "Despite supply constraints, we saw double digit revenue and unit shipment growth in emerging markets like China and India as well as overall notebook share gains in retail at mainstream price points. Through disciplined execution and continued innovation we will look to accelerate our growth and refine our focus on lower power, emerging markets, and the cloud."

63.     Accompanying the October 27, 2011 press release was a 'CFO Commentary' in which the Company acknowledged some difficulties with 32 nm production that limited the supply of Llano, but nevertheless reiterated that sales were strong due to "unanticipated sales strength in the Channel through the end of the quarter".   The October 27, 2011 CFO Commentary stated, in pertinent part:

**Q3 2011 AMD Results**

**Revenue** was $1.69 billion, up 7% compared to the second quarter of 2011 and up 4% compared to the third quarter of 2010.

Revenue in the third quarter of 2011 was adversely impacted by 32 nanometer (nm) yield, ramp and manufacturing issues experienced by one of our foundry partners, that limited supply of "Llano" – our 32nm Accelerated Processing Unit (APU). Additionally, 45nm supply was less than expected due to complexities related to the use of common tools across both technology nodes.

The sequential revenue increase was driven primarily by:

Record Mobile processor revenue and unit shipments, partially offset by lower Desktop processor revenue due to lower 45nm supply, and

Seasonally higher revenue in the Graphics segment.

In addition, since our preliminary results announcement in September 2011, we saw unanticipated sales strength in the Channel through the end of the quarter.

64.     In an AMD Form 10-Q filed with the SEC on or about November 11, 2011, the Company again acknowledged yield and other manufacturing difficulties with respect to Llano but nevertheless emphasized strong demand for the Company's APU products.   AMD also

emphasized a re-structuring of the manufacturing process to "obtain additional Llano products" in the fourth quarter 2011.  The November 11, 2011 Form 10-Q stated, in pertinent part:

> We continued to experience strong customer demand for our AMD Fusion family of accelerated processing unit (APU) products during the third quarter of 2011. As a result, over 90% of the processors for mobile devices that we shipped in the third quarter of 2011 consisted of APU products. We made progress towards improving our competitive position in our server business by commencing revenue shipments of our AMD OpteronTM 6200 Series server processors, codenamed Interlagos, at the end of the third quarter of 2011.
>
> We also experienced challenges during the third quarter of 2011, particularly related to supply shortages of certain microprocessor products manufactured using the 32nm and 45nm technology nodes, which adversely impacted our ability to fulfill customer demand. Specifically, GLOBALFOUNDRIES Inc. (GF) experienced yield and other manufacturing difficulties related to 32nm wafer fabrication, resulting in lower than expected supply of AMD Fusion A-series APUs, codenamed Llano, to us. We also experienced supply constraints for our 45nm microprocessor products due to complexities related to the use of common tools across both the 32nm and 45nm technology nodes and because we made the decision to shift volume away from products manufactured using the 45nm technology node in order to obtain additional Llano products. We continue to work closely with our foundry partner to improve yields. However, we expect that during the fourth quarter of 2011, we will continue to shift volume away from products manufactured using the 45nm technology node in order to obtain additional Llano products, and therefore, we expect that we will continue to experience some supply constraints for our 45nm microprocessor products during the fourth quarter of 2011, which would have an unfavorable impact on gross margin.

65.     In addition, the November 11, 2011 Form 10-Q shed further light on the relationship between AMD and GF, making clear that the price paid for 32nm wafers was based upon the quality and volume of the wafers, including the "manufacturing yield", stating in pertinent part:

> On April 2, 2011, we amended the Wafer Supply Agreement (WSA) with GF. Pursuant to the WSA, we currently purchase all of our microprocessor unit product requirements from GF, except APUs used in the Brazos platform. The primary effect of the amendment was to change the pricing methodology applicable to wafers delivered in 2011 for our microprocessor, including APU, products. The amendment also modified our existing commitments regarding the production of certain graphics processing unit (GPU) and chipset products at GF. Pursuant to the amendment, GF has committed to provide us with, and we have committed to purchase, a fixed number of 45nm and 32nm wafers per quarter in 2011. We pay GF a fixed price for 45nm wafers delivered in 2011. Our price for 32nm wafers varies based on the wafer volumes and

manufacturing yield of such wafers and is based on good die. In addition, we also agreed to pay an additional quarterly amount to GF during 2012 totaling up to $430 million if GF meets specified conditions related to continued availability of 32nm capacity as of the beginning of 2012. The pricing methodology set forth in the amended WSA applied to wafer purchases during the first nine months of 2011.

AMD CONTINUES TO TOUT DEMAND FOR LLANO IN 2012

66.   The Company continued to laud the success of Llano while simultaneously acknowledging difficulties with Llano production.  For example, in its 2012 Annual Report the Company included reassurances that the Llano product continued to draw strong customer demand.  The 2012 Annual Report stated in pertinent part

*Computing Solutions*

Computing Solutions net revenue of $5.0 billion in 2011 increased 4% compared to net revenue of $4.8 billion in 2010, primarily as a result of a 16% increase in unit shipments partially offset by an 11% decrease in average selling price. The increase in unit shipments was attributable to an increase in unit shipments of our microprocessors, including APU products for mobile devices, as well as our chipset products. Unit shipments of our microprocessors, including APU products for mobile devices increased due to strong demand for our Brazos and Llano-based APU platforms. However, the increase in unit shipments in 2011 was limited by supply constraints with respect to certain microprocessor products manufactured using the 32nm technology node. Chipset unit shipments increased primarily due to an increase in overall unit shipments of our microprocessor products. The decrease in overall average selling price was primarily attributable to a decrease in the average selling price of our microprocessors for servers due to a shift in our product mix and competitive market conditions as well as sales of our Brazos APU platforms, which have a lower average selling price than our other processor products.

…

**Overview**

In 2011, we experienced important changes in our business. First, we continued to develop and deliver differentiated products. We launched our AMD family of APU products and experienced strong customer demand, especially for our AMD E-Series and C-Series APUs designed for low-power desktop and mobile platforms, codenamed "Brazos," and our AMD A-Series APUs, codenamed "Llano," for mainstream desktop and mobile platforms. We introduced a number of competitive graphics products in 2011. In July 2011, we launched the AMD Radeon™ HD 6990M graphics processor designed for enthusiast mobile gamers. We also launched the AMD Radeon HD 7970 graphics processor in December 2011, our first graphics processor based on 28nm process technology and AMD's Graphic Core Next Technology. We also continued to focus on improving our competitive position in the server market and believe we

regained momentum in the second half of 2011 with the introduction of our new multi-core AMD Opteron™ 6200 and 4200 series processors, which are based on our "Bulldozer" x86 architecture.

. . .

However, our progress during 2011 was tempered by supply constraints related to our 32nm microprocessor products. We took steps during the course of the year to better manage our relationships with our third-party wafer foundries, and during the second half of 2011, 32nm yields and performance have improved.

67.     Similarly, on April 19, 2012, the Company filed with the SEC a Form 8-K containing a press release reporting the Company's first quarter 2012 financial results which again touted the success of the Company's Llano product and APUs.  The April 19, 2012 press release stated, in pertinent part:

SUNNYVALE, Calif. – April. 19, 2012 – AMD (NYSE:AMD) today announced revenue for the first quarter of 2012 of $1.59 billion, net loss of $590 million, or $0.80 per share, and operating loss of $580 million. The company reported non-GAAP net income of $92 million, or $0.12 per share, and non-GAAP operating income of $138 million. First quarter non-GAAP net income excludes: the previously disclosed charge of $703 million for a limited waiver of exclusivity of certain 28 nanometer (nm) APU products from GLOBALFOUNDRIES Inc.(GF) related to the 2012 Amendment to the Wafer Supply Agreement; amortization of acquired intangible assets of $1 million; a restructuring charge of $8 million; SeaMicro, Inc. (SeaMicro) acquisition costs of $6 million, and a tax benefit related to the SeaMicro acquisition of $36 million.

"AMD delivered solid results in the first quarter as we remain focused on improving our execution, delivering innovative products, and building a company around a strategy to deliver strong cash flow and earnings growth," said Rory Read, AMD president and CEO. "A complete top-to-bottom introduction of new APU offerings, combined with ample product supply resulting from continued progress with our manufacturing partners, positions us to win and grow."

68.     The April 19, 2012 press release was accompanied by a 'CFO Commentary' that similarly lauded the Company's Llano product, stating:

Llano is driving APU adoption in top-selling notebook SKUs in North America priced above $400

69.     On May 9, 2012, the Company filed with the SEC a Form 10-Q in which the Company reported its first quarter 2012 financial results.  In the May 9, 2012 Form 10-Q the

Company touted the success of Llano stating that "Unit shipments of our microprocessors for mobile devices increased due to strong demand for our Brazos and Llano-based APU platforms."

<u>THE TRUTH BEGINS TO EMERGE</u>

70.     By the summer of 2012 AMD was struggling to suppress evidence that demand for Llano was in fact weak, and that processing difficulties had in fact massively impacted sales of Llano.  On July 9, 2012, the Company issued a press release revealing that "channel sales" in China and Europe had lowered anticipated revenues for the quarter.  The July 9, 2012 press release stated in pertinent part:

> *SUNNYVALE, Calif. 7/9/2012*
> AMD (NYSE:AMD) today announced that revenue for the second quarter ended June 30, 2012 is expected to decrease approximately 11 percent sequentially. The company previously forecasted second quarter 2012 revenue to increase 3 percent, plus or minus 3 percent sequentially.  The lower preliminary revenue results are primarily due to business conditions that materialized late in the second quarter, specifically softer-than-expected channel sales in China and Europe as well as a weaker consumer buying environment impacting the company's Original Equipment Manufacturer (OEM) business.
>
> The company expects second quarter gross margin to be approximately in line with prior guidance. Operating expenses for the second quarter are expected to improve and to be approximately 8 percent less than prior guidance of approximately $605 million, a result of tightly controlled expenses in the quarter.

71.     On July 19, 2012, AMD hosted an earnings call to discuss the Company's second quarter 2012 financial results.  During the call, AMD executives, including defendant Su revealed that far from being the game changing, high demand product touted by the Company, Llano was in fact suffering from long-standing operational difficulties, including low demand beginning in 2011, a distribution process that had been tilted away from the 'channel' partners, and a long-standing problem with 'channel' customers being able to integrate the Llano product. The AMD July 19, 2012 earnings call transcript reads as follows, in pertinent part:

> **Rory P. Read** - Chief Executive Officer, President, Interim Chief Sales Officer and Member of The Board of Directors
>
> Thank you, Ruth. Clearly, our performance in the quarter was disappointing and did not meet our commitments. When I joined AMD last year, we laid out a set of

priorities to improve our execution and transform the company to sustain our long-term growth potential. This has not changed. In spite of the setback in the quarter, we continue to move forward confidently and we are taking the right steps to strengthen and transform our business.

For the second quarter, our revenue of $1.41 billion decreased 10% from a year ago and 11% sequentially, missing our expectations. After a reasonable start, we saw business velocity slow in the later part of the quarter driving this revenue miss. This second quarter revenue shortfall was largely driven by 2 key factors: first, weak sales of desktop processors in the channel, primarily in China and Europe; and secondly, a soft consumer PC market that impacted OEM notebook processor sales. We reacted quickly to this revenue softness by focusing on maintaining margin and effectively managing our expense position. As a result, we reduced expenses sequentially and maintained margin at approximately 46%, generating a net income of $37 million in the quarter.

…

Looking at the specifics of the desktop business, sales to OEMs increased sequentially based on their continued adoption of APUs. However, our desktop channel revenue declined simply as our Llano product did not experience the same uptake it had with our OEM customers. Looking back, when we were significantly 32-nanometer supply constrained last year, we prioritized shipments of Llano to our OEM customers. As a result, channel partners saw a dramatic change in supply linearity and a misalignment with motherboard availability. This clearly impacted Llano sales and built inventory in the channel.

Correcting our channel challenges with Llano is largely within our own control. Moving forward, we will focus on accelerating desktop channel sell-through, ensure proper supply linearity and more effectively position Llano's value proposition in this area. It is clear that the overall PC market experienced softness in the second quarter, particularly in the consumer space. This impacted our notebook processor business. As the slowdown accelerated late in the quarter, OEMs responded quickly in an effort to reduce their inventory exposure at retailers and limit their on-hand inventories. We made the decision to protect our notebook margin and not chase lower margin business as the environment weakened at the end of the quarter.

…

**Rory P. Read** - Chief Executive Officer, President, Interim Chief Sales Officer and Member of The Board of Directors

Sure, Hans. From a standpoint, this originated back in last year when we had that first Llano supply chain issue. And of course, you know, Hans, that we had to target our supply to our OEMs, and that was the right thing to do. As we introduced Llano late in the year to the channel that those motherboards had been there for some period of time and really damaged linearity, and pricing wasn't at the right levels as we exited the year. As we moved forward into 2012, the uptake on Llano in the channel wasn't as strong as we expected. And what we're doing here moving forward, Hans, is

we're focused on improving and focusing on sellout activity throughout the tiers of the channel, improving the communication of our value proposition into this key segment and to make sure that we make -- deliver on this momentum in the desktop channel around linearity with our channel partners. Does that help, Hans?

**Hans C. Mosesmann** - Raymond James & Associates, Inc., Research Division

Yes. Just to confirm, so the uptake in the channel was due to a sudden availability of Llano, or had the motherboards been already kind of designed for another processor?

**Rory P. Read** - Chief Executive Officer, President, Interim Chief Sales Officer and Member of The Board of Directors

No, the mismatch occurred early in the cycle as we went through this in terms of they were introduced to the channel earlier in the cycle. Then as the Llano product came in late in the year of 2012 [2011 - Rory Read misspoke when he referred to late 2012 because the conference call occurred in the July 2012.  Rory Read meant to say "late in the year 2011"], there was a mismatch in terms of the pricing, et cetera. This impacted linearity. And then we didn't enjoy the same uptake that we saw around Llano that we saw with our OEMs.

…

**Lisa T. Su** - Senior Vice President and General Manager of Global Business Unit

Yes, let me make a couple comments on that. So Llano is a good product. If you look at where we're selling, it's selling into both notebook and desktop OEMs as well as the channel. We got ourselves a bit out of position admittedly and that's a big reason for our shortfall. But when we look forward, it's really the focus on sellout velocity and getting the overall positioning correct with both the CPUs as well as the motherboards. And we think we're doing that. Trinity will also be an excellent product that will go into the channel and I think we will run with both products for some time in the channel.

72.     The comments attributable to defendant Su in the July 19, 2012 AMD earnings call are misleading.  Llano was not close to reaching "sellout velocity".  Within a few months of the call AMD had written off $100 million of Llano related inventory.  What is clear from defendant Su's comments identified above is that Llano was being cannibalized by AMD's new Trinity product, which would further hasten Llano's demise.

73.     Following the July 19, 2012 news, the trading price of AMD shares fell dramatically from a high of $5.07 per share to a low of $4.20 per share on July 20, 2012.

74.    On October 11, 2012, the Company issued a press release which included the news that "weaker than expected demand across all product lines" had caused lower than anticipated preliminary revenue results, and that AMD's gross margins would be significantly lower than expected due to an inventory write-down of approximately $100 million "due to lower than anticipated future demand for certain products."   The "certain products" would subsequently be revealed as Llano.  The October 11, 2012 press release stated, in pertinent part:

> *SUNNYVALE, Calif. 10/11/2012*
>
> AMD (NYSE:AMD) today announced that revenue for the third quarter ended September 29, 2012 is expected to decrease approximately 10 percent sequentially. The company previously forecasted third quarter 2012 revenue to decrease 1 percent, plus or minus 3 percent, sequentially.  The lower than anticipated preliminary revenue results are primarily due to weaker than expected demand across all product lines caused by the challenging macroeconomic environment.
>
> The company now expects third quarter gross margin to be approximately 31 percent; less than the previous expectation of approximately 44 percent primarily due to an inventory write-down of approximately $100 million due to lower anticipated future demand for certain products.  Third quarter gross margin was also negatively impacted by weaker than expected demand, which contributed to lower than anticipated average selling prices (ASPs) for the company's Computing Solutions Group products and lower than expected utilization of its back-end manufacturing facilities.
>
> Operating expenses for the third quarter are expected to decline approximately 7 percent sequentially as a result of tightly controlled expenses in the quarter.

75.    On October 18, 2012, the Company filed with the SEC a Form 8-K containing a press release reporting AMD's third quarter 2012 financial results.  The October 18, 2012 press release revealed that far from the operational success the Company had portrayed, Llano was the cause of the $100 million write-down in inventory.  In other words, Llano was unsellable.  The October 18, 2012 Form 8-K stated, in pertinent part:

> Gross margin decreased sequentially due to an inventory write-down of approximately $100 million primarily consisting of first generation A-Series Accelerated Processor Units (APUs) ("Llano"), weaker-than-expected demand, which contributed to lower average selling prices (ASPs) for the company's microprocessor products and lower utilization of the company's back-end manufacturing facilities.

76.     The 'CFO Commentary' accompanying the October 18, 2012 Form 8-K reiterated that the cause of the $100 million write-down was lower demand for Llano, stating in pertinent part:

> **Gross margin** was 31% primarily due to an inventory write-down of approximately $100 million due to lower than anticipated future demand for certain products. The write-down was comprised mainly of first generation A-Series APU products ("Llano") which adversely impacted gross margin by approximately 8 percentage points. Third quarter gross margin was also negatively impacted by weaker than expected demand, which contributed to lower ASPs for the company's microprocessor products and lower utilization of back-end manufacturing facilities.

77.     Tellingly, the October 18, 2012 CFO Commentary revealed that shipments of AMD's "2nd Generation A-Series APU", code-named Trinity, had almost doubled in the quarter and represented a significant percentage of "notebook shipments".  In other words, Trinity was cannibalizing Llano.

78.     Following the news disseminated by the Company on October 18, 2012, the trading price of the Company's stock fell from a high of $2.78 per share on October 18, 2012 to a low of $2.17 per share on October 19, 2012.

79.     It is clear from the aforementioned press releases, SEC Filings and Company conference calls that the Company disseminated false and misleading information about Llano during the Relevant Time Period.  In particular the Company falsely stated that demand for Llano was strong, when in fact, as was known to Company executives, sales of Llano had been plagued by production problems, demand had been weak, sales of Llano to the channel had been disfavored, and the Company's Trinity product had quickly cannibalized the Llano market.  All of this was known to AMD executives throughout the Relevant Time Period.  As described above Company executives admitted as much in AMD conference calls.  Further, given the short life-cycle of microprocessor products, and the complexities involved in having microprocessor products integrated into customer products, it is evident that senior AMD executives were aware of the extent of the difficulties facing AMD in selling Llano.

VIOLATIONS OF GAAP

80.     The failure of Board members to disclose material information regarding Llano means a significant number of public statements about the Company's operations were materially incomplete, in violation of federal rules and regulations governing corporate disclosures and in violation of United States' 'Generally Acceptable Accounting Provisions' ("GAAP"). GAAP are those accounting principles recognized in the accounting profession as appropriate in the United States. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading and accurate.

81.     The Company's reported financial statements, as identified above, were in violation of GAAP and at least the following principles:

a.     FASB Statements of Concepts No. 1, 34. (the principle that financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions);

b.     FASB Statements of Concepts No 1, 40. (the principle that financial reporting should provide information about the economic resources of a company, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources);

c.     FASB Statements of Concepts No 1, 50. (the principle that financial reporting should provide information about how management of a company has discharged its stewardship responsibility to owners (stockholders) for the use of a company's resources entrusted to it);

d.     FASB Statements of Concepts No 2, 58-59. (the principle that financial reporting should be reliable in that it represents what it purports to represent);

e.     FASB Statements of Concepts No 2, 79. (the principle that completeness); and

f.     FASB Statements of Concepts No 2, 95. (the principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered).

82.     Here, it readily apparent that the Company violated its disclosure obligations pursuant to the GAAP measures identified above and therefore Board members failed to implement internal corporate controls necessary for the Company to meet its disclosure obligations.

### VIOLATIONS OF THE AMD CORPORATE GOVERNANCE DOCUMENTS

83.     The failure of Board to disclose the extent of the operational and production difficulties faced by AMD in selling Llano violated the Company's own AMD Corporate Governance Documents, as described above.

### FALSE AND MISLEADING STATEMENTS IN AMD PROXIES FILED WITH THE SEC

84.     During the Relevant Time Period, AMD has repeatedly filed with the SEC annual proxy statements.  The annual proxy statements were filed on the following dates: March 15, 2012 (the "March 15, 2012 Proxy Statement"); March 25, 2013; (the "March 25, 2013 Proxy Statement"); March 25, 2014 (the "March 25, 2014 Proxy Statement"); and March 12, 2015 (the "March 12, 2015 Proxy Statement").  The March 15, 2012 Proxy Statement, the March 25, 2013 Proxy Statement, the March 25, 2014 Proxy Statement and the March 12, 2015 Proxy Statement are hereinafter collectively referred to as the "AMD Proxy Statements".

85.     The March 15, 2012 Proxy Statement stated, in pertinent part:

**AUDIT AND FINANCE COMMITTEE REPORT**

The Audit and Finance Committee of the Board of Directors consists of Dr. Barnes, as Chair, Mr. Chow and Mr. Palmer. Each of the members of the Audit and Finance Committee is "independent," and "financially literate," as determined by the Board of Directors and in compliance with NYSE and SEC rules. In addition, Dr. Barnes was designated an "audit committee financial expert," as the Board interprets that designation.

The Audit and Finance Committee oversees our internal audit function and independent registered public accounting firm and assists the Board in fulfilling its oversight responsibilities on matters relating to the integrity of AMD's financial statements, AMD's compliance with legal and regulatory requirements, the performance of our internal audit function and the independent registered public accounting firm's qualifications, independence and performance by meeting regularly with the independent registered public accounting firm, our senior management and our

internal audit, financial, and legal personnel. Management is responsible for the preparation, presentation and integrity of AMD's financial statements. The independent registered public accounting firm is responsible for performing an audit of AMD's annual financial statements and expressing an opinion as to the conformity of AMD's audited financial statements with U.S. generally accepted accounting principles.

In fulfilling its oversight responsibilities, the Audit and Finance Committee reviewed and discussed AMD's audited financial statements for the fiscal year ended December 31, 2011 with management and Ernst & Young LLP, AMD's independent registered public accounting firm. The Audit and Finance Committee also discussed with Ernst & Young LLP the matters required to be discussed by Statement on Auditing Standards No. 61, as amended, as adopted by the Public Company Accounting Oversight Board (PCAOB) in Rule 3200T. This included a discussion of the independent registered public accounting firm's judgments as to the quality, not just the acceptability, of AMD's accounting principles and such other matters that generally accepted auditing standards require to be discussed with the Audit and Finance Committee. The Audit and Finance Committee also received the written disclosures and the letter from Ernst & Young LLP required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the audit committee concerning independence, and the Audit Committee discussed the independence of Ernst & Young LLP with that firm.

Based on the Audit and Finance Committee's review and discussions noted above, the Audit and Finance Committee recommended to the Board, and the Board approved, that the audited financial statements be included in AMD's Annual Report on Form 10-K for the fiscal year ended December 31, 2011 for filing with the SEC.

The Audit and Finance Committee and the Board also have recommended, subject to stockholder ratification, the selection of Ernst & Young LLP as AMD's independent registered public accounting firm for fiscal 2012.

AUDIT AND FINANCE COMMITTEE
February 9, 2012
W. Michael Barnes, Chair
Henry WK Chow
Robert B. Palmer

86.     The March 25, 2013 Proxy Statement stated in pertinent part:

**AUDIT AND FINANCE COMMITTEE REPORT**

The Audit and Finance Committee of the Board of Directors consists of Dr. Barnes, as Chair, Mr. Chow, Mr. Harding and Mr. Palmer. Each of the members of the Audit and Finance Committee is "independent," and "financially literate," as determined by the Board of Directors and in compliance with NYSE and SEC rules. In addition, Dr. Barnes was designated an "audit committee financial expert," as the Board interprets that designation.

The Audit and Finance Committee oversees our internal audit function and independent registered public accounting firm and assists the Board in fulfilling its oversight responsibilities on matters relating to the integrity of AMD's financial statements, AMD's compliance with legal and regulatory requirements, the performance of our internal audit function and the independent registered public accounting firm's qualifications, independence and performance by meeting regularly with the independent registered public accounting firm, our senior management and our internal audit, financial, and legal personnel. Management is responsible for the preparation, presentation and integrity of AMD's financial statements. The independent registered public accounting firm is responsible for performing an audit of AMD's annual financial statements and expressing an opinion as to the conformity of AMD's audited financial statements with U.S. generally accepted accounting principles.

In fulfilling its oversight responsibilities, the Audit and Finance Committee reviewed and discussed AMD's audited financial statements for the fiscal year ended December 29, 2012 with management and Ernst & Young LLP, AMD's independent registered public accounting firm. The Audit and Finance Committee also discussed with Ernst & Young LLP the matters required to be discussed by Public Company Accounting Oversight Board Auditing Standard No. 16. This included a discussion of the independent registered public accounting firm's judgments as to the quality, not just the acceptability, of AMD's accounting principles and such other matters that generally accepted auditing standards require to be discussed with the Audit and Finance Committee. The Audit and Finance Committee also received the written disclosures and the letter from Ernst & Young LLP required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the audit committee concerning independence, and the Audit Committee discussed the independence of Ernst & Young LLP with that firm.

Based on the Audit and Finance Committee's review and discussions noted above, the Audit and Finance Committee recommended to the Board, and the Board approved, that the audited financial statements be included in AMD's Annual Report on Form 10-K for the fiscal year ended December 29, 2012 for filing with the SEC.

The Audit and Finance Committee and the Board also have recommended, subject to stockholder ratification, the selection of Ernst & Young LLP as AMD's independent registered public accounting firm for fiscal 2013.

AUDIT AND FINANCE COMMITTEE
February 6, 2013
W. Michael Barnes, Chair
Henry WK Chow
John R. Harding
Robert B. Palmer

87.    The March 25, 2014 Proxy Statement stated, in pertinent part:

## AUDIT AND FINANCE COMMITTEE REPORT

The Audit and Finance Committee of the Board consists of Dr. Barnes, as Chair, Mr. Chow and Mr. Harding. Each of the members of the Audit and Finance Committee is "independent" and "financially literate," as determined by the Board and in compliance with NYSE and SEC rules. In addition, Dr. Barnes was determined to be an "audit committee financial expert," as that term is defined under SEC rules.

The Audit and Finance Committee oversees our internal audit function and independent registered public accounting firm and assists the Board in fulfilling its oversight responsibilities on matters relating to the integrity of AMD's financial statements and AMD's internal controls over financial reporting, AMD's compliance with legal and regulatory requirements, the performance of our internal audit function and the independent registered public accounting firm's qualifications, independence and performance by meeting regularly with the independent registered public accounting firm, our senior management and our internal audit, financial, and legal personnel. Management is responsible for the preparation, presentation and integrity of AMD's financial statements and internal controls. The independent registered public accounting firm is responsible for performing an audit of AMD's annual financial statements and of the effectiveness of AMD's internal controls over financial reporting, and expressing an opinion on both in accordance with the Standards of the Public Company Accounting Oversight Board (United States).

In fulfilling its oversight responsibilities, the Audit and Finance Committee reviewed and discussed AMD's audited financial statements for the fiscal year ended December 28, 2013 with management and Ernst & Young LLP, AMD's independent registered public accounting firm. The Audit and Finance Committee also discussed with Ernst & Young LLP the matters required to be discussed by Public Company Accounting Oversight Board Auditing Standard No. 16. This included a discussion of the independent registered public accounting firm's judgments as to the quality, not just the acceptability, of AMD's accounting principles and such other matters that generally accepted auditing standards require to be discussed with the Audit and Finance Committee. The Audit and Finance Committee also received the written disclosures and the letter from Ernst & Young LLP required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the audit committee concerning independence, and the Audit Committee discussed the independence of Ernst & Young LLP with that firm.

Based on the Audit and Finance Committee's review and discussions noted above, the Audit and Finance Committee recommended to the Board, and the Board approved, that the audited financial statements be included in AMD's Annual Report on Form 10-K for the fiscal year ended December 28, 2013 for filing with the SEC.

The Audit and Finance Committee and the Board also have recommended, subject to stockholder ratification, the selection of Ernst & Young LLP as AMD's independent registered public accounting firm for fiscal 2014.

AUDIT AND FINANCE COMMITTEE
February 5, 2014
W. Michael Barnes, Chair
Henry WK Chow
John R. Harding

88.    The March 12, 2015 Statement Proxy stated in pertinent part:

**AUDIT AND FINANCE COMMITTEE REPORT**

The Audit and Finance Committee of the Board consists of Dr. Barnes, as Chair, and Messrs. Chow, Householder and Inglis. Each of the members of the Audit and Finance Committee is "independent" and "financially literate," as determined by the Board and in compliance with SEC and Nasdaq rules. In addition, Dr. Barnes was determined to be an "audit committee financial expert," as that term is defined under SEC rules.

The Audit and Finance Committee oversees our internal audit function and independent registered public accounting firm and assists the Board in fulfilling its oversight responsibilities on matters relating to the integrity of AMD's financial statements and the effectiveness of AMD's internal control over financial reporting, AMD's compliance with legal and regulatory requirements, the performance of our internal audit function and the independent registered public accounting firm's qualifications, independence and performance by meeting regularly with the independent registered public accounting firm, our senior management and our internal audit, financial, and legal personnel. Management is responsible for the preparation, presentation and integrity of AMD's financial statements and maintaining effective internal control over financial reporting. The independent registered public accounting firm is responsible for performing an audit of AMD's annual financial statements and of the effectiveness of AMD's internal control over financial reporting, and expressing opinions on both in accordance with the standards of the Public Company Accounting Oversight Board (United States).

In fulfilling its oversight responsibilities, the Audit and Finance Committee reviewed and discussed AMD's audited financial statements for the fiscal year ended December 27, 2014 with management and Ernst & Young LLP, AMD's independent registered public accounting firm. The Audit and Finance Committee also discussed with Ernst & Young LLP the matters required to be discussed by Public Company Accounting Oversight Board Auditing Standard No. 16. This included a discussion of the independent registered public accounting firm's judgments as to the quality, not just the acceptability, of AMD's accounting principles and such other matters that generally accepted auditing standards require to be discussed with the Audit and Finance Committee. The Audit and Finance Committee also received the written disclosures and the letter from Ernst & Young LLP required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the audit committee concerning independence, and the Audit Committee discussed the independence of Ernst & Young LLP with that firm.

Based on the Audit and Finance Committee's review and discussions noted above, the Audit and Finance Committee recommended to the Board, and the Board approved, that the audited financial statements be included in AMD's Annual Report on Form 10-K for the fiscal year ended December 27, 2014 for filing with the SEC.

The Audit and Finance Committee and the Board also have recommended, subject to stockholder ratification, the selection of Ernst & Young LLP as AMD's independent registered public accounting firm for fiscal 2015.

AUDIT AND FINANCE COMMITTEE
W. Michael Barnes, Chair
Henry WK Chow
Joseph A. Householder
Michael J. Inglis

89.     In each of the AMD Proxy Statements the relevant Audit and Finance Committee Report failed to reveal the weaknesses in AMD's internal controls that led to the dissemination of the misstatements and material omissions as described in detail herein.  The Individual Defendants knew or reasonably should have known of these misstatements and omissions and yet failed to prevent or correct them from being disseminated.

EXPOSURE TO THE FEDERAL SECURITIES LAWSUIT

90.     The aforementioned disclosure failures of Board members has exposed the Company to the Federal Securities Lawsuit in which it is alleged that the Company violated federal securities laws in issuing misleading statements to the market.  Defendants in the Federal Securities Lawsuit include defendant Su who served as the Company's Senior Vice President and General Manager of Global Business Unit.  The Federal Securities Lawsuit is filed in this Court.  In broad terms, AMD shareholders in the Federal Securities Lawsuit allege that senior AMD executives were aware of production problems related to Llano in 2010 when the roll-out of Llano was delayed, but falsely reassured investors that such problems had been resolved.  In addition, shareholders have alleged that the Company failed to disclose distribution and demand problems associated with Llano and therefore Llano was not the game-changing product the Company had touted to investors.  On March 31, 2015, Judge Yvonne Gonzalez Rogers denied defendants' motion to dismiss the claims in the Federal Securities Lawsuit, holding plaintiff shareholders had sufficiently alleged the Company had made misleading statements about Llano's chip production.  The failure of Board members to ensure the Company disseminated

accurate information to the Company's investors has therefore exposed the Company to significant risk and damages in the form of the Federal Securities Lawsuit.

**DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**

91.     Plaintiff brings this action derivatively in the right and for the benefit of AMD to redress injuries suffered, and to be suffered, by AMD as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  AMD is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

92.     Plaintiff will adequately and fairly represent the interests of AMD and its shareholders in enforcing and prosecuting its rights.

93.     Plaintiff is the owner of AMD common stock and was the owner of AMD common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

94.     At the time that this action was commenced, the Board consisted of the Individual Defendants.

95.     As a result of the facts set forth herein, Plaintiff did not made any demand on the AMD Board to institute this action against the Individual Defendants.  Such a demand would have been a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

(a)     There is reason to doubt that all Board members have complied with their fiduciary duties, thereby excusing demand.  The entire Board has demonstrated an inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors for the violations of law complained of herein.  As alleged herein, throughout the Relevant Time Period the Company has failed to establish internal policies to inform shareholders about the misstatements and omissions relating to Llano, including before asking

1   shareholders to elect Board members, therefore, no reasonable AMD stockholder would believe

2   that a majority of the members of the Board would be able to independently and properly

3   consider a demand in good faith and, accordingly, demand is excused.

4          (b)     Of the eleven member Board, seven were Board members and / or executives in

5   2011 and / or 2012 during the time information about the production and distribution problems

6   associated with Llano was initially withheld from AMD shareholders.  Therefore, no reasonable

7   AMD stockholder would believe that a majority of the members of the Board would be able to

8   independently and properly consider a demand in good faith and, accordingly, demand is

9   excused.

10         (c)     All the Board members are potentially liable for the wrongful conduct alleged

11  because all the current Board members had Board status during the Relevant Time Period.

12  Accordingly, demand is excused as against the entire Board.

13         (d)     Defendant Su is a named defendant in the Federal Securities Lawsuit and

14  therefore is facing liability for the wrongful conduct alleged therein.  No reasonable AMD

15  stockholder would believe that defendant Su would be able to independently and properly

16  consider a demand in good faith and, accordingly demand is excused as against Su.

17         (e)     The principal professional occupation of defendant Su is Chief Executive Officer

18  and President of AMD.  Therefore, no reasonable AMD stockholder would believe that Su would

19  be able to independently and properly consider a demand in good faith and, accordingly demand

20  is excused as against Su.

21         (f)     Each Board member in failing to implement the internal controls necessary to

22  properly conduct director affairs, as alleged herein, and has therefore violated the ethical goals

23  stated in the AMD Corporate Governance Documents.  Therefore, demand as against the entire

24  Board is excused.

25

26

27

28
                              VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

**COUNT I**

**(DERIVATIVE CLAIM ON BEHALF OF THE COMPANY AGAINST ALL INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF 14(a) OF THE EXCHANGE ACT AND SEC REGULATIONS)**

4

5

96.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

6

7

97.     This claim is brought under Section 14 of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9.

8

9

98.     Section 14 of the Exchange Act prohibits the solicitation of any proxy in contravention to the rules promulgated thereunder.

10

11

12

13

14

99.     Rule 14a-9 provides that no proxy solicitation shall be made by means of any proxy statement or other communication containing "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false and misleading."

15

16

17

18

19

20

21

100.     The Individual Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders which were contained in the AMD Proxy Statements which misrepresented or failed to disclose, inter alia, the facts set forth above relating to the Company's production, roll-out and distribution of Llano.  By reasons of the conduct alleged herein, each of the Individual Defendants violated Section 14(a) of the Exchange Act.  This information would have been material to the Company's shareholders in determining whether to elect or reelect directors to manage their Company.

22

23

101.     The Company has been damaged as a result of the material misrepresentation and omissions contained in the AMD Proxy Statements.

24

25

26

102.     Plaintiff, on behalf of the Company, thereby seeks to void the election of the Individual Defendants based upon the misleading and incomplete proxy materials.  The Court should require Defendants to distribute corrected disclosures and hold a new vote.

27

28

## COUNT II
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR FAILING TO MAINTAIN INTERNAL CONTROLS)

103.    Plaintiff incorporates by reference all the preceding and subsequent paragraphs as if fully set forth herein.

104.    As alleged herein, each of the Individual Defendants has a fiduciary duty to, among other things exercise good faith in their roles as directors of the Company and to act in the interests of the Company's shareholders.  For the reasons described above, the Individual Defendants have failed to act in the interests of the Company's shareholders by failing to implement necessary internal controls to ensure the Company disseminates accurate and complete information to the Company's shareholders and the broader investment community, including ahead of shareholder votes to elect Board members.

105.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, AMD has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

106.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

107.    Plaintiff, on behalf of AMD, has no adequate remedy at law.

## COUNT III
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACHES OF FIDUCIARY DUTY FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY)

108.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.    The Individual Defendants owed and owe AMD fiduciary obligations of good faith, fair dealing, loyalty and due care.

110.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.  As alleged herein, the Individual Defendants have failed to implement adequate internal controls to

1   ensure implement policies and controls to ensure the dissemination of accurate information to the

2   Company's shareholders and the broader investment community.

3        111.   As a direct and proximate result of the Individual Defendants' failure to perform

4   their fiduciary obligations, AMD has sustained significant damages, not only monetarily, but

5   also to its corporate image and goodwill.

6        112.   As a result of the misconduct alleged herein, the Individual Defendants are liable

7   to the Company.

8        113.   Plaintiff, on behalf of AMD, has no adequate remedy at law.

**COUNT IV**
**(AGAINST ALL THE INDIVIDUAL DEFENDANTS FOR**
**ABUSE OF CONTROL)**

11        114.   Plaintiff incorporates by reference and re-alleges each and every allegation

12   contained above, as though fully set forth herein.

13        115.   The Individual Defendants' misconduct alleged herein constituted an abuse of

14   their ability to control and influence AMD, for which they are legally responsible.  In particular,

15   the Individual Defendants abused their positions of authority by failing to implement internal

16   controls necessary to the proper running of the Board in the interests of all the Company's

17   shareholders.

18        116.   As a direct and proximate result of the Individual Defendants' abuse of control,

19   AMD has sustained significant damages.

20        117.   As a result of the misconduct alleged herein, the Individual Defendants are liable

21   to the Company.

22        118.   Plaintiff, on behalf of AMD, has no adequate remedy at law.

**COUNT V**
**(AGAINST ALL THE INDIVIDUAL DEFENDANTS FOR**
**GROSS MISMANAGEMENT)**

25        119.   Plaintiff incorporates by reference and re-alleges each and every allegation set

26   forth above, as though fully set forth herein.

120.    The Individual Defendants have a duty to AMD and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of AMD.

121.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of AMD in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence and candor in the management and administration of AMD's affairs and in the use and preservation of AMD's assets.

122.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused AMD to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to AMD, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged AMD.

123.    As a direct and proximate result of Individual Defendants' failure to perform their fiduciary obligations, AMD has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

124.    As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

125.    Plaintiff, on behalf of AMD, has no adequate remedy at law.

**COUNT VI**
**(AGAINST ALL THE INDIVIDUAL DEFENDANTS FOR**
**BREACH OF FIDUCIARY DUTY FOR DISSEMINATING**
**FALSE AND MISLEADING INFORMATION)**

126.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

127.    As alleged in detail herein, each of the Individual Defendants has a duty to ensure that AMD disseminated accurate, truthful and complete information to its shareholders.

128.    The Individual Defendants have violated their fiduciary duties of care, loyalty, and good faith by either causing or allowing the Company to disseminate materially misleading and inaccurate information to its shareholders through, inter alia, SEC filings and other public statements and disclosures as detailed herein, and / or by failing to implement internal controls to ensure the dissemination of misleading information to shareholders does not re-occur.

129.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, AMD has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

130.    As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

131.    Plaintiff, on behalf of AMD, has no adequate remedy at law.

**JURY DEMAND**

132.    Plaintiff demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Awarding to AMD restitution from the Individual Defendants, and each of them, and ordering disgorgement of any and all profits, benefits and other compensation obtained by the Individual Defendants;

C.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

D.    Ordering AMD to implement enhanced corporate governance and internal control procedures including to appropriately test and then strengthen AMD's internal audit and control functions;

1    E.    Void the election of the Individual Defendants based upon the misleading and

2 incomplete proxy materials and requiring the Individual Defendants to distribute corrected

3 disclosures and hold a new vote.

4    F.    Granting such other and further relief as the Court deems just and proper.

5

6 Dated: September 29, 2015          GLANCY PRONGAY & MURRAY LLP

7

8                      By: *s/ Kara M. Wolke*
                          Lionel Z. Glancy
                          Kara M. Wolke
9                         1925 Century Park East, Suite 2100
                          Los Angeles, California 90067
10                        Telephone:    (310) 201-9150
11                        Facsimile:    (310) 201-9160
                          Email:    lglancy@glancylaw.com
12                                   kwolke@glancylaw.com

13                        *Attorneys for Plaintiff Jake Ha*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DocuSign Envelope ID: 0AEBA622-AEE8-4DE5-AA72-5E4BD25Z778Z

VERIFICATION

I, Jake Ha, do hereby verify that I am a holder of common stock of Advanced Micro Devices, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Derivative Complaint ("Complaint").  I have authorized the filing of the Complaint.  I have reviewed the Complaint and all of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: September 04, 2015

DocuSigned by:

89DC93633E94437...

Jake Ha

314911.1 ADVANCEDMICRO