Lionel Z. Glancy (#134180)
Kara M. Wolke (#241521)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:     (310) 201-9150
Facsimile:      (310) 201-9160
Email: lglancy@glancylaw.com
          kwolke@glancylaw.com

*Attorneys for Plaintiff Jake Ha*
[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAKE HA, derivatively and on behalf of himself and all others similarly situated,<br><br>                Plaintiff,<br><br>        vs.<br><br>JOHN E. CALDWELL, HENRY WK CHOW, BRUCE L. CLAFLIN, NORA M. DENZEL, NICHOLAS M. DONOFRIO, MARTIN L. EDELMAN, JOHN R. HARDING, JOSEPH A. HOUSEHOLDER, MICHAEL J. INGLIS, LISA T. SU, AND AHMED YAHIA,<br><br>                Defendants,<br><br>and<br><br>ADVANCED MICRO DEVICES, INC.<br><br>                Nominal Defendant. | Case No.: 4:15-cv-04485-YGR<br><br><br>**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Jake Ha ("Plaintiff"), by and through his undersigned attorneys, brings this action derivatively on behalf of nominal defendant Advanced Micro Devices, Inc. ("AMD" or the "Company") and alleges upon personal knowledge as to himself and his own acts, and as to all other matters based upon the investigation conducted by his attorneys which included, among other things, a review of filings with the United States' Securities and Exchange Commission ("SEC"), documents, analyst reports, news reports, press releases, documents produced in discovery, and other publicly available information regarding the Company, as follows:

## INTRODUCTION

1.     This is a shareholder derivative action brought on behalf of AMD against the members of its Board of Directors ("Board") seeking to remedy defendants' breaches of fiduciary duties and other violations of the law that occurred from at least the beginning of 2011 through the present (the "Relevant Time Period").  Plaintiff's allegations concern the conduct of the Board in actively failing to implement any existing internal corporate controls necessary to ensure the Company disseminates accurate information to its shareholders and the broader investment community, and, further, failing to enact all internal corporate controls necessary to ensure the Company disseminates accurate information to its shareholders.

2.     Specifically, the allegations arise out of the Company's failure to provide material information concerning the Company's ill-fated product called Llano.  Llano utilized AMD's microprocessor "fusion" technology combining a computer processing unit ("CPU") with a Graphics Processing Unit ("GPU") onto one silicon computer chip.   AMD touted this microprocessor as the "next generation" and assured investors that the revolutionary chip was in a strong production cycle and had strong demand.

3.     In fact, the opposite was true.  Llano suffered from serious production difficulties and critical delays in distribution.   The production and rollout problems were of such a

magnitude that the Llano chip was forsaken by the microprocessor market in favor of AMD's next offering. Ultimately, AMD would write-off approximately $100 million in Llano related assets. As Llano's operational difficulties were belatedly disclosed to investors in late 2012, the trading price of AMD securities declined significantly.

4. Of the eleven-member Board at the time of filing this complaint in September 29, 2015, at least seven Board members were affiliated with the Company during the period when AMD disseminated misleading information to investors concerning the failed Llano product. Indeed, defendant Su served as AMD's Senior Vice President and General Manager, Global Business Units beginning in January 2012. Despite the Llano problems, the Board rewarded defendant Su with a promotion to the Company's Chief Executive Officer and President.

5. The failure of the Board to implement the proper internal controls as described herein caused the Company to suffer significant harm through the exposure to and settlement of a $29,500,000 federal securities lawsuit (the "Federal Securities Lawsuit"), harm to AMD's reputation, and a decline in the trading price of Company securities. All as a result of the Board's failure to implement necessary policies and protocols to ensure the accurate dissemination of material information by the Company and certain current and former executives, including defendant Su.

6. Here, Plaintiff, in a derivative capacity on behalf of the Company, seeks enactments of new internal controls and improved corporate governance to assure greater compliance with any existing internal policies and controls to ensure Company disclosure and accounting policies are brought up to standards acceptable for a publicly traded company and further to void a proxy votes that occurred during the Relevant Period at which AMD shareholders approved the election of Board members without full disclosure of the wrongful

behavior as described herein. Plaintiff further seeks restitution of all profits obtained by defendants resulting from their wrongful conduct.

**JURISDICTION AND VENUE**

7.    This Court has jurisdiction over all claims asserted herein. The jurisdiction of the Court is pursuant to 28 U.S.C. 1331 because Plaintiff's claims arise under Section 14(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78n(a). In addition, this Court has supplemental jurisdiction over the remaining claims alleged here pursuant to 28 U.S.C. 1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

8.    This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in, this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District court permissible under traditional notions of fair play and substantial justice.

9.    Venue is proper in this Court under 28 U.S.C. §1391(a) because: (1) one or more defendants either resides in, or maintains executive offices in, this District; (2) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred within this District, and (3) defendants have received substantial compensation in this District by conducting business herein and by engaging in numerous activities that have had an effect in this District.

**PARTIES**

PLAINTIFF

10.    Plaintiff is a current shareholder of AMD and has been a shareholder continuously throughout the Relevant Time Period. Plaintiff is a citizen of the state of California.

## NOMINAL DEFENDANT AMD

11. Defendant AMD is a corporation that designs and distributes technology for high-tech appliances such as personal computers, tablets and game consoles. The Company is active in the global semi-conductor industry. The Company is located at One AMD Place, Sunnyvale, California, 94088. The Company is incorporated in Delaware. The Company's shares are traded on the NASDAQ stock exchange under the symbol "AMD." Plaintiff believes AMD is a citizen of the states of California and Delaware.

## INDIVIDUAL DEFENDANTS

12. Defendant John E. Caldwell ("Caldwell") serves as a director on the Board and has served on the Board since 2006. Caldwell is a member of the Audit Committee and also serves as Chair of the Board's Nominating and Corporate Governance Committee. Caldwell is also a governing person of AMD Advanced Research LLC ("AMD Advanced Research"), a Delaware limited liability corporation located in Austin Texas. Plaintiff believes Caldwell is a citizen of Canada.

13. Defendant Henry WK Chow ("Chow") served as a director on the Board and served on the Board from 2011 to 2014. Chow served as a member of the Board's Audit and Financing Committee and the Nominating & Corporate Governance Committee. Chow is also a governing person of AMD Advanced Research. Plaintiff believes Chow is a citizen of the People's Republic of China.

14. Defendant Bruce L. Claflin ("Claflin") serves as a director on the Board and has served on the Board from 2003 to 2016. Claflin was the AMD Board chair from 2009 to 2016. Clafin also served as Chair of the Board's Nominating & Corporate Governance Committee. Clafin is also a governing person of AMD Advanced Research. Plaintiff believes Claflin is a citizen of Maine.

15.     Defendant Nora M. Denzel ("Denzel") serves as a director on the Board and has served on the Board since 2014.  Denzel serves the Chair of the Compensation and Leadership Resources Committee and a member of the Board's Nominating & Corporate Governance Committee.  Denzel, together with defendant Donofrio, serves on the boards of the National Association of Corporate Directors ("NACD"), which receives payments from AMD.  Plaintiff believes Denzel is a citizen of California.

16.     Defendant Nicholas M. Donofrio ("Donofrio") serves as a director on the Board and has served on the Board since 2009.  Donofrio also serves as Chair of the Board's Innovation and Technology Committee and as a member of the Board's Compensation Committee and the Board's Nominating & Corporate Governance Committee.  Donofrio is also a director at Liberty Mutual Holding Company, which does business with AMD, and also a member of the NACD.  Donofrio is also a governing person of AMD Advanced Research.  Plaintiff believes Donofrio is a citizen of Connecticut.

17.     Defendant Martin L. Edelman ("Edelman") served as a non-independent director on the Board and has served on the Board from 2013 to 2017.  Edelman is an attorney at Paul, Hastings, Janofsky & Walker LLP and acts as a senior advisor to Mubadala Development Company, PJSC ("Mubadala"), a company for which defendant Yahia is the CEO.  Edelman is also a governing person of AMD Advanced Research.  Plaintiff believes Edelman is a citizen of New York.

18.     Defendant John R. Harding ("Harding") served as a non-independent director on the Board and has served on the Board from 2012 to 2016.  Harding also served as a member on the Board's Innovation and Technology Committee.  Harding is also a governing person of AMD Advanced Research.  Plaintiff believes Harding is a citizen of Vermont.

19.     Defendant Joseph A. Householder ("Householder") serves as a director on the Board and has served on the Board since 2014.  Householder also serves as Chair of the Board's Audit and Finance Committee and as a member of Board's Nominating & Corporate Governance Committee.  Plaintiff believes Householder is a citizen of California.

20.     Defendant Michael J. Inglis ("Inglis") serves as a director on the Board and has served on the Board since 2014.  Inglis also serves as a member of the Board's Audit and Finance, Innovation and Technology, and Nominating & Corporate Governance Committees. Plaintiff believes Inglis is a citizen of the United Kingdom.

21.     Defendant Lisa T. Su ("Su") serves as a non-independent director on the Board and has served on the Board since 2014.  Su further serves as the Company's President and Chief Executive Officer ("CEO").   Plaintiff believes Su is a citizen of Texas.   Su served as the Company's Chief Operating Officer from July 2014 until October 2014 and as AMD's Senior Vice President and General Manager, Global Business Units beginning in January 2012.  Su is also a governing person of AMD Advanced Research.

22.     Defendant Ahmed Yahia ("Yahia") serves as a non-independent director on the Board and has served on the Board since 2012.  Yahia also serves as a member on the Board's Innovation and Technology Committee.  Yahia is the CEO of Mubadala, for which defendant Edelman serves as a senior advisor.   Yahia is also a governing person at AMD Advanced Research and a director on the board of GlobalFoundries, Inc. ("GlobalFoundries").   Plaintiff believes Yahia is a citizen of the United Arab Emirates.

23.     The Defendants identified above in paragraphs 12 through 22 are collectively referred to herein as the Individual Defendants.

24.     The Individual Defendants, by reasons of their status as directors on the Board, members of the Board's committees, and / or their executive positions within AMD have, and at

all relevant times have had, access to internal corporate documents, conversations and meetings within AMD. Therefore, the Individual Defendants know, and at all relevant times have known non-public information about AMD, its finances, business operations, and internal controls.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25. By reason of their positions as officers and directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe, and at all relevant times owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interests or benefit.

26. Each director and officer of the Company owes to AMD and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and directors of a publicly held company, the Individual Defendants have a duty to ensure the Company establishes proper internal controls so that the Company disseminates accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock is based on truthful and accurate information.

27. The Individual Defendants, because of their positions of control and authority as directors and/or officers of AMD, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

28.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of AMD, and was at all times acting within the course and scope of such agency.

29.     To discharge their duties, the officers and directors of AMD were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of AMD were required to, among other things:

a.     manage, conduct, supervise and direct the business affairs of AMD in accordance with all applicable laws;

b.     neither violate nor knowingly permit any officer, director or employee of AMD to violate applicable laws, rules and regulations;

c.     establish and maintain systematic and accurate records and reports of the business and affairs of AMD;

d.     neither engage in self-dealing nor knowingly permit any officer, director or employee of AMD to engage in self-dealing;

e.     ensure that the Company complied with its legal obligations and requirements;

f.     conduct the affairs of the Company in an efficient, business-like manner, to avoid wasting the Company's assets, and to maximize the value of the Company's stock to the Company's shareholders;

g.     ensure that the Company maintains an adequate system of financial controls such that the Company's financial reporting is true and accurate at all times; and

h.     remain informed of how AMD conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable

inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

30.     Each of the Individual Defendants, by virtue of his or her position as a director and officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants alleged herein involves violations of their obligations as directors and officers of AMD, the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders by failing to address the lack of internal controls that has led to the trading price of the Company's securities significantly decreasing and the Company being the subject of class action litigation alleging violations of federal securities laws.

AMD's Corporate Governance Documents

31.     The Company purports to conduct its business within a set of Principles of Corporate Governance (the "Principles").  The Company's webpage states the following:

> AMD's Board of Directors is responsible for selecting the Chief Executive Officer of the Company, monitoring the operating performance and financial condition of the Company, and overseeing the Company's adherence to corporate standards.

32.     The Company's webpage further provides a link to the Company's Principles, which state, in pertinent part:

> **9. Ethics and Conflicts of Interest**
>
> Each Director commits to act ethically at all times, and in compliance with the Company's Worldwide Standards of Business Conduct. The Board will not permit the waiver of any ethical policy for any Director or company Officer. Board member conflicts of interest must be disclosed immediately to the Chairman of the Board the Chief Executive Officer (if the office is separate from the Chairman), and the Lead Director (if a Lead Director has been appointed).

33. In addition to the Principles, AMD purports to ensure its executives and senior finance executives adhere to a Code of Ethics (the "Code"). The Code states, in pertinent part:

> This Code of Ethics ("Code") supports the commitment of the executive officers and senior finance executives of Advanced Micro Devices, Inc. ("AMD") and its related entities (collectively, the "Company") set forth on Schedule 1 attached hereto (collectively, the "Executives") to the highest ethical standards and compliance with laws, regulations and Company policies applicable to corporate financial transactions, reporting and disclosure. The Executives hold an important and elevated role in corporate governance – they are vested with responsibility to protect, balance and preserve the interests of the Company's stakeholders, including shareholders, customers, creditors, suppliers and employees, as well as citizens of the communities in which the Company does business. The Executives fulfill this responsibility, in part, by prescribing and enforcing appropriate policies and procedures for the Company's Finance Organization and by enforcing and adhering to the principles set forth in this Code. In addition to complying with this Code, the Executives, like all Company employees, must also conduct Company business in accordance with the principles set forth in AMD's Worldwide Standards of Business Conduct.
>
> **Business and Accounting and Financial Reporting Principles**
>
> The Executives will maintain Company transaction and reporting systems and procedures to ensure:
> • The Company adheres to the legal business and accounting practice requirements of each country and location in which it conducts business.
> • No undisclosed or unrecorded Company fund or asset is established for any purpose.
> • The Company's books and records contain no false or misleading entries.
> • No payment is made on the Company's behalf without adequate support documentation or for any purpose other than as described in the documents.
> • Business transactions are properly authorized and completely and accurately recorded in accordance with Generally Accepted Accounting Principles (GAAP) and pertinent Company policies.
> • Adherence to financial reporting requirements set forth in the laws and regulations that govern the Company's business. In this regard, Executives will ensure that accurate financial statements and disclosures of Company operations, financial conditions and cash flows are prepared, and that periodic financial reports are filed in a timely manner and in a manner that facilitates the highest degree of clarity of content and meaning.

• Preparation of documents, as may be required, certifying the appropriateness and accuracy of the statements and disclosures in periodic Company financial reports.

• Disclosure on a timely basis, as may be required, of all material transactions and relationships that may have a material current or future effect on the Company's business, financial condition and/or results of operations.

34. Furthermore, and as alluded to above, the Company purports to conduct its business pursuant to a set of Worldwide Standards of Business Conduct (the "WSBC"). Leading the WSBC is an open letter written by defendant Su making clear the Company is supposed to be managed legally, ethically and with integrity and transparency. The WSBC states, in pertinent part:

As such, our Worldwide Standards of Business Conduct detail our commitment to conduct business legally, ethically and with integrity and transparency. Our Standards are a pledge that we make as individuals and as a corporation to do the right thing in every business situation. They provide clear guidance on critical issues and simply put, are the backbone of our business.

Our focus is on (1) Building Great Products, (2) Driving Deep Customer Relationships and (3) Simplifying the Business. We are committed to doing this and living by our Worldwide Standards of Business Conduct. Doing the right thing is vital for AMD's growth and success. We are excited about our future and the great things we will accomplish.

Dr. Lisa Su
AMD President and Chief Executive Officer

* * *

**While the Standards frequently make reference to employees, they also apply to members of the Company's Board of Directors and to third parties who perform work for or on behalf of AMD.** All have a responsibility to understand and follow these Standards, and perform their work with honesty and integrity, including in areas not specifically addressed by the Standards.

Following the Standards is a must. In the event an employee, Board member, or other worker violates these Standards or related Company policies and procedures, or any of the laws and regulations that govern our business, or fails to cooperate or be honest with the Company in connection with an investigation, the Company will take immediate and

appropriate action, up to and including termination of employment or services.

**Responsibilities of all employees and those providing services to AMD:**

In line with our commitment to compliance and ethics, remember YOU are the key. Integrity is everyone's responsibility. In this regard, you are responsible for:
• Obeying the applicable laws and regulations governing our business conduct.
• Being honest, fair and trustworthy in your AMD activities and relationships.
• Keeping confidential, safeguarding, and properly using all information entrusted to you by AMD or our customers or by third parties with whom we do business.
• Fostering an atmosphere in which equal opportunity extends to every member of the AMD community.
• Maintaining confidentiality of and not misusing Company "insider" information.
• Avoiding situations where personal interests are or appear to be in conflict with the Company's interests.
• Protecting the environment and creating a safe workplace.
• Keeping accurate records.
• Learning the details of the policies connected with your work. While you may not know those policies word for word, you need to have a basic understanding of issues covered by each policy, and you should have a more detailed understanding of policies that apply most directly to your job.
• Applying the AMD Way to all business decisions.
• Using common sense: if you would not be comfortable having your conduct described in the media, then DON'T DO IT.
• Promptly reporting: if you have any concerns about possible illegal or unethical behavior, including any violations of these Standards, or if you have any concerns about a possible request or suggestion to violate an AMD policy or any applicable law or regulation.

* * *

**2. Business, Financial and Accounting Practices**

Company employees and agents are required to adhere to the business, financial reporting, and accounting practice requirements of the Company and the laws in each country in which the Company conducts business, and shall employ the highest ethical standards. No undisclosed or unrecorded Company fund or asset shall be established for any purpose, and no false or misleading entries shall be made in the Company's books

or records. No payment on behalf of the Company shall be made without adequate support documentation or for any purpose other than as described in the documents. Employees shall comply with United States generally accepted accounting rules, unique accounting requirements for certain public sector end-users, local statutory reporting regulations and the Company's internal control policies as established in their respective locations.

Appropriate personnel shall prepare accurate financial statements and disclosures of the Company. Such periodic reports shall be filed in a timely manner in accordance with the applicable laws and regulations and in compliance with the Company's internal control processes. As required, employees must also prepare statements certifying the effectiveness of the Company's internal control processes over financial reporting and the appropriateness and accuracy of the financial statements and disclosures. In addition, appropriate personnel shall fulfill all disclosure requirements regarding material transactions and relationships that may have a material current or future effect on the Company's financial condition.

In the unlikely event that the Company determines that it is required to prepare an accounting restatement due to material noncompliance with any financial reporting laws applicable to the Company and that it is required to recover from you any incentive-based or other compensation (including any equity awards) paid or granted to you, the Company may pursue all remedies available to or required of it under law, including recovery of any such compensation. (emphasis added.)

35. The Principles, the Code and the WSBC are hereinafter referred to collectively as the "AMD Corporate Governance Documents". The AMD Corporate Governance Documents make clear that either the Individual Directors know or should know that AMD is required to implement internal corporate controls to ensure the Company and its agents act ethically in conducting Company business. The conduct complained of here, including the failure of the Board to ensure accurate information was disseminated to the Company's shareholders and to communicate that failure to AMD's shareholders ahead of shareholder votes to elect Board members, demonstrates the failure of the Board to ensure proper internal controls have been established at the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

36.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

37.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did:

> (a)     Fail to implement and maintain adequate internal controls so as to properly inform the Company's shareholders about the Company's operations, including ahead of shareholder votes to elect Board members;

> (b)     Fail to implement and maintain adequate internal controls to ensure Board members acted in the interests of the Company's shareholders; and

> (c)     Maintain the Individual Defendants' executive and directorial positions at AMD and the profits, power and prestige that the Individual Defendants enjoy as a result of these positions.

38.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing and substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

COMPANY BACKGROUND

39.     According to AMD's 2015 annual report filed with the SEC on or about February 19, 2015 (the "2015 Annual Report"), the Company is a global semiconductor company offering

primarily two products within the semiconductor industry; (1)'x86 microprocessors', used as standalone devices or incorporated as an accelerated processing unit ("APU"), chipsets, discrete graphics processing units ("GPUs") and professional graphics; and (2) server and embedded processors, dense servers, semi-custom System-on-Chip ("SoC") products and technology for game consoles.

40.     In the Relevant Time Period, microprocessors were the Company's core product, accounting for approximately 66% of AMD's revenues in 2011 and approximately 61% of AMD's revenues in 2012.  AMD is the second-largest global supplier of microprocessors based on the x86 architecture used in computers and laptops, second only to Intel, its major competitor. AMD's business is seasonal, with most sales occurring during the back-to-school and holiday periods in the third and fourth quarters.  In 2011 and 2012, AMD generated more than half of its revenues from emerging markets such as China.

41.     Semiconductors are components used in a variety of electronic products and systems.   An integrated circuit ("IC") is a semiconductor device that consists of many interconnected transistors on a single chip. The 2015 Annual Report states that a microprocessor is an IC that serves as the central processing unit ("CPU") of a computer, generally consisting of hundreds of millions or billions of transistors that process data and control other devices in the system, acting as the "brain" of the computer. Microprocessors are produced via in a fabrication plant or "foundry,"  creating a silicon wafer which hosts the transistor chips that make up the microprocessor. A foundry produces the silicon wafers by first melting and shaping silicone into what looks like along silicon tube, which is then cut up into "wafers." These wafers measure approximately 8-12 inches in diameter but are very thin – measuring only 1-2 millimeters thick. Transistors that make up the chips are then "etched" onto the wafer, which is then cut into tiny microprocessor chips. One wafer can contain hundreds or even thousands of microprocessor

chips, yet not all of the chips are usable. The number of working chips that come from a wafer are referred to as the "yield." This process takes place in strict sterile environments called "clean rooms" as even the smallest particle of dust can ruin a chip. The chip manufacturing process can take up to 3 months to complete.

42. Most of the Company's microprocessor chips were manufactured by GlobalFoundries, a semiconductor fabrication plant that was created by the divestiture of AMD's manufacturing arm in 2009. By the end of 2009, AMD owned 32% of GlobalFoundries; by the end of 2010, AMD owned 23%; and by the end of 2011, AMD owned 10% and had one board seat. The Company sold its remaining interest in GlobalFoundries in April 2012. According to the Company's Form 10-Ks from 2009 through 2011, GlobalFoundries was considered a "Related Party." At the Analyst Investor Day on February 2, 2012, John Docherty, Head of Manufacturing Operations described the "deep relationships" AMD has with their suppliers, including their foundries, i.e., GlobalFoundries. He stated: "[Every day] calls for a long period of time. Intimate, sitting down, often, frequent, everyday drumbeats. We are on calls, our team are on calls, or are involved in hands-on face-to-face meeting with our supplier base every day, 7 days a week and that's what it takes. And again, I repeat, they're not always pleasant meetings… In fact, let me assure you, they've got more pleasant in last quarter than they were the last previous quarter [referring to the yield issues with GlobalFoundries]." With regard to the fabrication process of AMD products, Docherty confirmed that "AMD is involved every step of the way."

43. Former AMD president and CEO Rory Read ("Read") verified his own personal involvement with GlobalFoundries when he stated during the October 27, 2011 3Q 2011 earnings conference call that he personally "spent a lot of time with their [GlobalFoundries]

executive team [dealing with the yield issue] and they're bought in just as significantly at GLOBALFOUNDRIES as AMD to work with us and to find the right path here."

44.   The 2015 Annual Report states that the performance of a microprocessor is a critical factor impacting the performance of computing and entertainment platforms, such as desktop PCs, notebooks, tablets and workstations.   The principal elements used to measure CPU performance are work-per-cycle (or how many instructions are executed per cycle), clock speed (representing the rate at which a CPU's internal logic operates, measured in units of gigahertz, or billions of cycles per second) and power consumption.   Other factors impacting microprocessor performances include the number and type of cores in a microprocessor, the bit rating of the microprocessor, memory size, and data access speed.

45.   In order to function inside of a computing system, a microprocessor must be plugged into a circuit board called a motherboard.   Different microprocessors are compatible with different types of motherboards.   AMD does not manufacture its own motherboards.   Rather, AMD works with motherboard manufacturers in its distribution channel to develop and manufacture motherboards which are compatible with its products.

46.   According to the 2015 Annual Report, since the invention of the transistor in 1948, improvements in IC process and design technologies have led to the development of smaller, more complex and more reliable ICs at a lower cost-per-function.   The 2015 Annual Report states that "[c]onsumers increasingly demand computing devices, including desktop and notebooks PCs, and smaller form factors, such as tablets and 2-in-1s (PCs that can function both as a notebook or a tablet), with improved end-user experience, system performance and energy efficiency.   Consumers also continue to demand thinner and lighter mobile devices, with better performance and longer battery life."   In 2006, AMD started the AMD Fusion Project to develop a new microprocessor that combined both a CPU with a GPU on a single chip, which was

expected to dramatically increase the performance of a computing system. After nearly five years of development, the Company announced that it was launching a family of microprocessors that combined a CPU and GPU into what AMD called an Accelerated Processing Unit or APU. The 2015 Annual Report states that an APU is a processing unit that integrates a CPU and a GPU onto one chip (or one piece of silicon), along with, in some cases, other special-purpose components. This integration enhances system performance by "offloading" selected tasks to the best-suited component (i.e., the CPU or the GPU) to optimize component use, increasing the speed of data flow between the CPU and GPU through shared memory and allowing the GPU to function as both a graphics engine and an application accelerator. Having the CPU and GPU on the same chip also typically improves energy efficiency by, for example, eliminating connections between discrete chips. This combined chip also reduced cost which was expected to be attractive to AMD's customers. This family of APU products included AMD's E-Series and C-Series APUs, codenamed "Brazos," designed for low-end desktop and mobile platforms, and its' A-Series APUs, codenamed "Llano," for high-end desktop and mobile platforms. AMD began shipping Brazos to its customers late in the fourth quarter of 2010 so that the customers could integrate Brazos into computer products to be ready for sale to consumers when Brazos "officially" launched in January 2011. Llano's launch was scheduled for June 2011 (and thus AMD began shipping Llano to customers months ahead of the June launch so they could include Llano as part of a notebook or PC for sale to end users in June).

47. The 2015 Annual Report also provides information concerning the Company's marketing and sales strategies, stating that the Company sells its products both through a direct sales force and through third-party, independent distributors and sales representatives in both domestic and international markets. AMD sells its microprocessors to original equipment

manufacturers or "OEMs" like Hewlett Packard, Dell, and Sony, and through independent third party distributors also known as the 'channel' distributors, who sell to smaller OEMS, primarily in emerging markets. The Company purports to operate its sales on the basis of "product forecasts" provided by the particular customer.

48. AMD sales arrangements generally operate on the basis of product forecasts provided by the particular customer, but do not typically include any commitment or requirement for minimum product purchases. Distributors typically maintain an inventory of AMD products and AMD usually has agreements with distributors to protect AMD products against price reductions and provide return rights with respect to any product that AMD has removed from its price book that is not more than twelve months older than the manufacturing code date. In addition, some agreements with AMD distributors contain standard stock rotation provisions permitting limited levels of product returns.

49. Engagement with OEM and channel customers is an important part of ensuring that AMD's products are sold. According to the Company's Form 10-K filed on February 24, 2012, AMD's sales and marketing teams work closely with AMD customers to define product features, performance, and timing of new products so that the products AMD develops meet customers' needs. To that end, AMD employs application engineers to assist its customers in designing, testing, and qualifying system designs, including motherboards that incorporate AMD products, in order to assist in optimizing product compatibility. As AMD stated: "We believe that our commitment to customer service and design support improves our customers' time-to-market and fosters relationships that encourage customers to use the next generation of our products."

50. This collaboration is important because AMD must work with its customers to make sure that its microprocessors are incorporated into computing systems such as desktops or

laptops for sale. This process does not occur overnight. AMD must ship product to its customers months ahead of the product's commercial "launch" (in other words – availability to the end-user), so that the customer can build a system, like a desktop or a laptop, around the microprocessor.

51. The 2015 Annual Report further provides information concerning the competitiveness of the IC industry, which is described as "intensely competitive." Products are described as competing on "timely product introductions, product quality (including enabling state-of-the art visual experiences), power consumption (including battery life), reliability, processor clock speed, performance, size (or form factor), selling, price, cost, adherence to industry standards (and the creation of open industry standards), level of integration, software and hardware compatibility and stability, brand recognition, and availability.

52. Further, the 2015 Annual Report states that technological advances in the microprocessor industry result in "frequent product introductions, regular price reductions and short product life cycles for some products, and increased product capabilities that may result in significant performance improvements."

DISSEMINATION OF INFORMATION TO THE INVESTMENT COMMUNITY

53. As expected from a publicly traded company, AMD periodically issues press releases and submits filings with the SEC purporting to detail the Company's business and finances. The Company is required by its own AMD Corporate Governance Documents in addition to various third-party rules and regulations (both private and governmental) to ensure that the information in such press releases and SEC filings is accurate. It is the responsibility of the Board to ensure the Company has the necessary policies and protocols to ensure the Company complies with its reporting responsibilities.

54. During the Relevant Time Period, AMD publicly lauded the performance and prospects of its Llano product. In a January 20, 2011 press release, Thomas J, Seifert, ("Seifert") AMD's former Chief Financial Officer and former interim Chief Executive Officer, touted the new platform's strength and the effect it would have on profitability: "AMD enters 2011 with significant momentum, amplified by the successful launch of our first Fusion APUs …. I am confident we can drive profitable growth based on the strength of new products we will bring to market. Our customers recognize that Fusion APUs are at the core of delivering the world's most vivid digital experiences." On April 21, 2011, during AMD's 1Q 2011 earnings conference call, Seifert emphasized the importance of the Fusion APU products to AMD's strategy: "Beyond its unique performance characteristics, Fusion is also a **key part of our overall profitability strategy**." (emphasis added.)

55. On a conference call on January 20, 2011, Seifert reported strong sales of the Brazos:

> Focusing more specifically on the fourth quarter, industry momentum for Fusion is strong and growing. OEM adoption of Brazos is excellent. We've shipped more than 1 million Brazos platforms in its debut quarter to world-class OEMs, including Acer, ASUS, Dell, HP, Lenovo, MSI, Samsung, Sony and Toshiba.

56. Analysts saw the new Fusion APUs as a critical development for the future of AMD. A January 21, 2011 analyst report published by Think Equity, called "AMD's Fusion platform strategy … a game-changer," stating "[w]e believe that AMD's Fusion platform strategy for next-generation processor and graphics on the same chip will likely lead to revolutionary platforms for desktop and notebook PCs." On that same day, Barclays wrote that AMD's "APU offering rollouts remains key in delivering gross margin expansion" and noted that the APU Fusion product would give AMD the ability to be competitive with its rival Intel.

57.     AMD required support from the hardware and software communities because the APUs had to be integrated into other systems such as personal computers in order to function, and software had to be adapted in order to use it.  In a January 4, 2011 press release, the Company announced that AMD's APUs had received broad support from leading computer manufacturers such as Acer, Asus, Dell, Fujitsu, HP, Lenovo, Samsung, Sony, and Toshiba.  In a separate press release dated January 4, 2011, the Company stated it had "broad support" for its Fusion family of APUs "from software and hardware ecosystem community."  "Working closely with software vendors, developers and motherboard suppliers, AMD has built a coalition of industry innovators committed to providing devices and applications that leverage the combined x86 computing power and discrete-level graphics performance of AMD Fusion APUs."

58.     AMD's March 7, 2011 press release noted "growing support from the PC software community with more than 50 mainstream applications currently accelerated by the new AMD Fusion Family of Accelerated Processing Units (APUs)."  John Taylor, AMD's Director of Client Product and Software Marketing, stated: "The huge number of applications that are ideally suited to benefit from the performance and stunning graphics offered by AMD Fusion processors is testament to our close collaboration with leading software developers."

59.     Taylor also discussed the highly anticipated Llano launch, which would occur three months later: "We anticipate doubling the number of applications in the next few months as we approach the launch of the A-Series 'Llano' APU, the next member of the AMD Fusion family that is designed to enable more than 500 GFLOPs of parallel processing power in mainstream notebooks and desktops."  Given the support of the hardware and software community, it was expected that Llano would have a widely successful launch.

60.     Throughout the APU launch, AMD indicated the significance of its channel customers, particularly in the emerging markets, which were AMD's largest markets.  In 2009,

the Company started the Fusion Partner Program, to provide the distribution channel with "robust training, sales-enablement resources, exclusive partner events, and joint marketing campaigns." On February 16, 2011, AMD issued a press release announcing that it had been named EMEA Components Vendor of the Year at the "EMEA Channel Academy: 2011 Awards." The honor was presented to AMD for its "partner engagement, channel strategy and overall partner programmes, amongst other factors." Darren Grasby, AMD's Corporate Vice President, Sales, for Europe and Emerging Markets stated:

> We are thrilled to receive this prestigious award recognizing our complete dedication and commitment to the channel …. 2010 has been a great year for AMD and it's never been a better time to be an AMD partner. The recent launch of the AMD Fusion Family of APUs, designed to transform the computing experience of end users, highlights AMD's ability to provide innovative technology you can trust. This accolade from our peers and the very channel partners we serve highlights that our commitment is well-placed.

61. At the February 17, 2011 Goldman Sachs Technology and Internet Conference, Seifert discussed how he was personally traveling across the country to engage AMD customers across their whole customer "portfolio" regarding the new Fusion products:

> They [the customers] help us and push us in the right direction, make sure that we understand their needs, and make sure that we understand how we can better support them moving forward from a product portfolio, from a feature perspective, also from a sales infrastructure perspective, really important. And wherever there is need for action, we will act. We will not lose time in this period. And I think they appreciate that and with the actions we have been able to demonstrate over the last couple of weeks, I think they find we are on the right path.

62. On February 18, 2011, AMD announced a new marketing campaign, "Ready. Willing. And Stable. to encourage component channel companies and PC enthusiasts to drive opportunities for our world-class AMD CPUs [APUs] and GPUs as the ideal solution for building the best PC today."

63. In an AMD New Release issued March 15, 2011, the Company stated, "We are working closely with our ODM [original design manufacturing] partners to help them build the small-form factor, long battery life PCs [using APUs] that can help them differentiate from the competition and succeed in today's competitive market."

64. AMD announced in a press release on March 28, 2011 that it was honored on CRN's 5 Star Partner Program Guide for the second year in a row. "Through the AMD FPP[Fusion Partner Program], AMD equips channel partners with the resources they need to drive profitability with an extensive, industry-leading portfolio." The press release stated: "We are dedicated to bringing our partners the support and product innovation they rely on to grow their business."

65. On May 18, 2011, senior vice president and general manager, AMD Products Group, Rick Bergman ("Bergman") stated:

> The upcoming 'Llano' APU, combined with our popular C- and E-series AMD Fusion APUs, represents one of the most significant leaps forward in computing in decades. Our 'Llano' Fusion APU will enable consumers to enjoy a brilliant high definition experience along with unprecedented discrete-level GPU compute power for a notebook PC …. We are very excited to be here in Abu Dhabi to share with the region firsthand what the AMD Fusion family of APUs will mean for the industry moving forward as well as highlight the role of GLOBALFOUNDRIES in helping us bring our 32nm APUs to market.

66. Llano was touted as a "next generation" product enabling "supercomputer-like performance" and long battery life, and was even described by the Company in a June 2011 press release as "perhaps the industry's biggest architectural change since the invention of the microprocessor." The June 2011 press release stated in pertinent part:

> *SUNNYVALE, Calif. 6/14/2011*

> AMD (NYSE: AMD) today announced the next generation in mainstream consumer computing with the availability of the new high-performance AMD Fusion A-Series Accelerated Processing Units (APUs). Enabling truly immersive computing experiences in consumer notebooks

and desktops, the AMD A-Series APUs enable brilliant HD graphics, supercomputer-like performance and over 10.5 hours of battery life.

In an increasingly digital and visually oriented world, consumers are placing ever-higher priorities on multitasking, vivid graphics, lifelike games, lag-free videos, and ultimate multimedia performance. To meet these needs, the AMD A-Series APUs combine up to four x86 CPU cores with powerful DirectX®11-capable discrete-level graphics and up to 400 Radeon™ cores along with dedicated HD video processing on a single chip. AMD A-Series APUs also allow for advanced capabilities such as gestural interfaces, multi-monitor support, 3D entertainment and real-time image stabilization.

"The AMD A-Series APU represents an inflection point for AMD and is perhaps the industry's biggest architectural change since the invention of the microprocessor," said Rick Bergman, senior vice president and general manager, AMD Products Group. "It heralds the arrival of brilliant all-new computing experiences, and enables unprecedented graphics and video performance in notebooks and PCs. Beginning today we are bringing discrete-class graphics to the mainstream."

The AMD A-Series APUs (previously codenamed "Llano") are currently shipping and scheduled to appear in more than 150 notebooks and desktops from leading OEMs throughout the second quarter of 2011 and beyond. Delivering powerful serial and parallel computing capabilities for HD video, 3D rendering and data-intensive workloads in a single-die processor, the AMD A-Series APUs offer software developers unprecedented power and potential in an ever smaller package.

67. On August 8, 2011, Bergman told investors that APU Fusion products meant "better performance…better cost from a platform perspective, and…better power."

68. At the February 2, 2012 Analysts Day, Read stated "[]Lisa Su's team, they are meeting every day with customers across the planet. I've met with – I don't know, 250, 300 major customers and partners and channel members over the past 5 months."

69. Similarly, the Company's annual report filed on February 24, 2012 (the "2012 Annual Report") also highlighted the importance of Llano to the Company, stating in pertinent part:

**Overview**

In 2011, **we experienced important changes in our business.** First, we continued to develop and deliver differentiated products. We launched our AMD family of APU products and experienced strong customer demand, especially for our AMD E-Series and C-Series APUs designed for low-power desktop and mobile platforms, codenamed "Brazos," and our AMD A-Series APUs, codenamed "Llano," for mainstream desktop and mobile platforms. (emphasis added.) We introduced a number of competitive graphics products in 2011. In July 2011, we launched the AMD Radeon™ HD 6990M graphics processor designed for enthusiast mobile gamers. We also launched the AMD Radeon HD 7970 graphics processor in December 2011, our first graphics processor based on 28nm process technology and AMD's Graphic Core Next Technology. We also continued to focus on improving our competitive position in the server market and believe we regained momentum in the second half of 2011 with the introduction of our new multi-core AMD Opteron™ 6200 and 4200 series processors, which are based on our "Bulldozer" x86 architecture.

…

Our AMD Fusion Accelerated Processing Unit, or APU, combines our CPU and GPU onto a single piece of silicon. We believe that high performance computing workloads, workloads that are visual in nature and even traditional applications such as photo and video editing or other multi-media applications can benefit from our accelerated computing architecture.

70.     "Brazos" were the Company's first generation APUs, and were based on 40 nanometer ("nm") technology which had been around for years.  Llano was based on the new 32nm technology, allowing for a smaller chip and longer battery life. Llano was designed to be a high-end processor, whereas Brazos was designed to be a low-end processor.   This was significant because unlike Brazos, Llano was expected to be, as Seifert described, "highly gross margin accretive" which would drive profits.  During a conference call with analysts on January 20, 2011, Seifert stated that "a strong expansion of our Llano ramp will allow us to grow into a market segment."   On a February 17, 2011 call, Seifert told the market "[w]e have high expectations on the launch of our Llano products that will lead to market share gain over the year."

71.     Seifert indicated that Brazos' success would drive even more success for Llano, AMD's high-margin product: "So I think the momentum we have seen in January is going to continue now moving into the second quarter making sure that [the Llano] launch is successful." Seifert noted that an "increase in price performance because the new products, especially Llano, allows us to play in product SKUs that we have not been able to touch before."  In an August 25, 2011 conference call, Seifert stated: "[w]e have made no secret out of it that the launch of -- especially of the mainstream part of our Fusion family [i.e., Llano] is going to be a big lever for us to improve pricing mix and price performance for the Company moving forward."

72.     Llano allowed AMD to compete against Intel's "Sandy Bridge" 32nm processor. Both processors used 32nm technology and had integrated graphics processors and CPUs on the same chip, but Llano had a more sophisticated graphics system.  John Taylor, AMD's Director of Client Product and Software Marketing, demonstrated this difference at the CEBIT 2011 Conference in Hanover, Germany, in a video documenting the demonstration that was widely distributed to the market on March 3, 2011.  AMD believed it would gain market share from Intel by positioning Llano against Sandy Bridge.

73.     Analysts understood AMD the importance of Llano to AMD's ability to compete with Intel.  On October 19, 2010, Bloomberg commented that "Llano is part of a push to integrate advanced graphics into processors, creating products that rival Intel."  Barclays stated in a report published January 21, 2011, "Llano/Fusion APU offering rollouts remains key in delivering gross margin expansion while also enabling AMD to remain competitive with new [Intel] Sandy Bridge."  On May 16, 2011, Sterne Agee stated that Llano would allow "AMD [to] continue to gain share [from Intel] in the integrated graphics chips market in C2Q11.... AMD's Llano ASPs [average selling price] are very competitive to [Intel's] SandyBridge ASPs with good graphics performance."  Dow Jones Newswire stated in a July 21, 2011 article "[w]hile

Intel's chips first targeted mainstream and high-end computing, AMD's were geared toward low-end notebooks and netbooks. AMD recently introduced its Llano chip for mainstream PCs, and Chief Financial Officer Thomas Seifert said Thursday that Llano should allow AMD to 'increasingly participate' in mainstream and performance notebook segments."

74.    Throughout the Relevant Time Period, AMD repeatedly touted both the positive impact of the Llano product to the Company and the anticipated benefits of Llano to AMD. For example, on April 21, 2011 the Company filed with the SEC a Form 8-K containing a press release highlighting purported demand for its Llano product. The April 21, 2011 press release stated in pertinent part:

>**SUNNYVALE, Calif. – Apr. 21, 2011** – AMD (NYSE:AMD) today announced revenue for the first quarter of 2011 of $1.61 billion, net income of $510 million, or $0.68 per share, and operating income of $54 million. The company reported non-GAAP net income of $56 million, or $0.08 per share, and non-GAAP operating income of $92 million.

>"First quarter operating results were highlighted by strong demand for our first generation of AMD Fusion Accelerated Processing Units (APUs)," said Thomas Seifert, CFO and interim CEO. "APU unit shipments greatly exceeded our expectations, and we are excited to build on that momentum now that we are shipping our 'Llano' APU."

>…

>Computing Solutions segment revenue decreased 2 percent sequentially and increased 3 percent year-over-year. The sequential decrease was driven primarily by lower average selling price (ASP) partially offset by higher desktop microprocessor sales. The year-over-year increase was primarily driven by strong microprocessor unit sales in the channel.

>…

>AMD commenced revenue shipments of AMD's first Fusion APU for mainstream notebooks (codenamed "Llano") that combines discrete-class graphics capabilities, personal supercomputing performance and AMD AllDay™ power.

75.    Attached to the April 21, 2011 Form 8-K was a 'CFO Commentary' which also purported to inform investors about the successes of the Llano product, stating in pertinent part:

**Q1 2011 Segment Results – Computing Solutions**

**Computing Solutions segment revenue** was $1.2 billion, down 2% compared to the fourth quarter of 2010, primarily due to:

- lower server and notebook microprocessor sales driven by ASP declines, partially offset by higher desktop microprocessor sales

- weak demand in mature markets partially offset by moderate growth in demand in emerging economies

APU platforms are gaining traction in the market as evidenced by a faster than anticipated ramp as unit shipments tripled over the prior quarter. Adding to this momentum, we started shipping Llano, our high-end APU, late in the first quarter of 2011.

76.    During the April 21, 2011 conference call, Seifert called Llano "the most impressive processor in history [because][i]t delivers a better end-user experience than anything else on the market, and our customers have told us that."  Similarly, in a June 14, 2011 press release entitled: "AMD Ushers in Next Generation of Computing With AMD A-Series APUs," Bergman stated that "[t]he AMD A Series APU represents an inflection point for AMD and is perhaps the industry's biggest architectural change since the invention of the microprocessor," and "[i]t heralds the arrival of brilliant all-new computing experiences, and enables unprecedented graphics and video performance in notebooks and PCs.  Beginning today we are bringing discrete-class graphics to the mainstream."

77.    In fact, the touted success of Llano, as described above, was false and misleading because the Company was experiencing significant operational problems with Llano, related in part to the production of silicon chips.  Further, the limited life-cycle of microprocessor products meant that the operational difficulties described above and the accompanying delays in distribution would lead to limited demand for the Llano product so much so that AMD would

delay distribution through its third-party 'channels' and favor instead direct distribution to customers.

78.     The silicon chips necessary for the production of Llano had been beset by production difficulties leading to the delayed launch of the product.  In July 2010, Dirk Meyer ("Meyer"), AMD's then Chief Executive Officer, stated the delayed roll-out of Llano was due to difficulties with the nanometers supporting the Llano products.  Meyer stated, in pertinent part:

> Customer systems based on Ontario are planned to be available early next year. Llano our Fusion APU offering aimed at the higher end of the client market is also generating positive customer response. However, in reaction to Ontario's market opportunities and a slower than anticipated progress of 32 nm yield curve, we are switching the timing of the Ontario and Llano production ramps.

> Llano production shipments are still expected to occur in the first half of next year. In the second quarter this year we also taped out the first 32 nm product based on our new high performance Bulldozer CPU core. We plan to begin sampling our Bulldozer based server and desktop processors in the second half of this year and remain on track for 2011 launches. These new processors will deliver significant performance improvements to the AMD platform."

79.     Market analysts reported on the delayed Llano launch.   Xbit Laboratories published an on-line article on July 16, 2010 describing how the operational difficulties with Llano involved a lower than anticipated 'yield' associated with the underlying 32 nanometer technology.  The Xbit Laboratories article stated, in pertinent part:

> Earlier it was expected that AMD will start to ship its Llano accelerated processing units (APUs) for revenue already in Q4 2010 with official product launch taking place sometime very early in 2011. It is not clear whether AMD has problems wedding the Llano design to the 32nm SOI fabrication process, there are issues with the process itself or the design of the Llano has certain flaws. In any case, the start of commercial shipments slipped by two months, according to AMD.

> "We have seen the rate of yield leaning below our plans on 32nm. [...] We take a bit more time to work on the 32nm yields up the curve. So, the effective change [...] to our internal plans on Llano amounts to a couple of months," said Mr. Meyer.

80.     On August 4, 2010, Wedbush Securities analyst Patrick Wang noted: "AMD's delayed release schedule for its Llano processor, based on its new Fusion design, puts it at a competitive disadvantage to Intel," in light of Intel's "launch of its Sandy Bridge processor… It's extremely important they execute on the Fusion products that should be rolling out in the next few quarters."

81.     Nevertheless, AMD assured investors that operational problems related to Llano and production yields were resolved and the Company continued to tout the operational success of Llano.  For example, in an April 4, 2011 conference call with analysts, Seifert stated that the 32 nanometer yields were in line with the Company's expectations, were on target and that issues associated with the 32 nanometer yields were behind the Company.

82.     During the call, the Company also announced a new Wafer Supply Agreement ("WSA") with GlobalFoundries.  The WSA "tied the 32 nanometer pricing to paying for good 32 nanometer die [or individual chips]."   Rather than paying GlobalFoundries for whole wafers (which could contain both good and bad chips), AMD would now only pay for good 32nm chips on the wafers.  AMD also agreed to make additional quarterly payments to GlobalFoundries during 2012 if GlobalFoundries met specified conditions related to continued 32nm capacity in 2012. Defendants denied that the new WSA signaled a yield problem, indicating that yield was in line with expectations and that the yield problem was behind AMD.  Rather, Defendants represented that the WSA merely provided AMD downside protection and would ensure that GlobalFoundries would provide sufficient yields of the 32nm Llano chip by highly incentivizing GlobalFoundries' production of the chip.

83.     Analysts were reassured by Defendants statements about yield and the changes in the WSA and believed it signaled a smooth ramp for Llano. In a report issued on April 4, 2011, an analyst from Sterne Agee stated:

AMD over the weekend also amended its wafer supply agreement with GlobalFoundries (GF), securing its 32nm wafer supply. We believe this should be positive as AMD ramps 32nm Llano and new Server products later in the year. This should enable AMD to transition from current 40nm to 32nm and drive better margins.

84. On that same day, an analyst from Wells Fargo issued a report stating that the new WSA agreement had actually decreased the risk of a Llano delay due to yield issues:

We had been concerned that there may be further delays on Llano, and it would appear that the risk of another pushout to the Llano schedule is dropping. AMD was able to reaffirm its 2011 gross margin expectation while temporarily moving to a foundry payment scheme (payment for good die rather than for wafers) which we think involves lower risk.

85. During the April 21, 2011 conference call, AMD also announced "solid" first quarter results due to its new APU platform (Brazos). Seifert also assured the market that "Llano based systems [would be] available in this [the second] quarter." Seifert told the market that the success with Brazos, which included "tripling unit shipments of…Brazos" in the quarter, would be followed by an even greater ramp of the higher ASP [average selling price] Llano. Bergman acknowledged that the timing of the Llano ramp was "critical," insofar as Llano was set to launch during the important back-to-school season, but Seifert assured investors that AMD would have "ample…product" of the Llano processor available for sale. Seifert also touted AMD's emerging market success, the "strong demand" and adoption of APUs in the channel, and called it a "very strong channel business."

86. The market clearly understood Defendants' statements to mean that Llano was in "successful production." For example, on April 25, 2011, Susquehanna Financial Group LLP published a report about AMD, stating:

Still plenty of opportunity to gain share this year. We believe the opportunity for AMD this year is fairly straightforward and fairly well understood – Brazos, Llano and Bulldozer for servers, which all have the potential to take share and be accretive to margins if successful. Although production risks are smaller now that Llano is in successful production.

87. Defendants continued to hide AMD's yield problem from investors. During a May 17, 2011 JP Morgan Technology, Media, and Telecom Conference, Seifert again touted the Llano launch and told the market that there was "no tightness in wafer supply. There are no signs that we are going to be wafer constrained from a pure wafer capacity point of view at this point in time." Seifert also reiterated the importance of the Llano model because it would be "margin accretive from a price performance point of view because it allows us to upsell. It allows us to play in segments of the notebooks that we have not been able, and price SKUs that we have not been able to address before." Seifert stated that Llano would have a meaningful impact on the business in the "second half of the year." Based on this "strength especially in the second half," the Company "increased their gross margin guidance to a range of 44% to 48%" for the year.

88. On July 21, 2011, the Company filed with the SEC a Form 8-K including a press release announcing the Company's Second Quarter 2011 financial results. The July 21, 2011 press release stated, in pertinent part:

> **AMD Reports Second Quarter Results**
>
> …
>
> Accelerating Fusion Accelerated Processor Unit (APU) shipments drive record microprocessor unit shipments and record mobile microprocessor unit shipments
>
> **SUNNYVALE, Calif. – July 21, 2011** – AMD (NYSE:AMD) today announced revenue for the second quarter of 2011 of $1.57 billion, net income of $61 million, or $0.08 per share, and operating income of $105 million. The company reported non-GAAP net income of $70 million, or $0.09 per share, and non-GAAP operating income of $114 million.
>
> "In the first half of 2011, AMD brought to market the most competitive client offerings in our history, reinforcing our position as a design and innovation powerhouse," said Thomas Seifert, CFO and Interim CEO. "Today's computing experience is increasingly being defined by the ability to deliver brilliant multimedia and video content with all day

battery life. Fusion APUs are ideal to meet this need, positioning AMD to gain unit market share in the mobile computing space."

89. Attached to the July 2011 Form 8-K was a 'CFO Commentary', in which the Company again touted the operational success of Llano and the significance of Llano to the Company's overall performance, stating, in pertinent part:

**Q2 2011 Segment Results – Computing Solutions**

**Computing Solutions segment revenue** was $1.2 billion, flat compared to the prior quarter as higher mobile processor revenue was offset by lower server and desktop microprocessor revenue.

- In a seasonally down quarter, AMD's successful regional assortment helped offset seasonal trends as we capitalize on growth with key strategic OEMs, while making progress in key growth areas such as China and Latin America.

- record mobile processor unit shipments were driven by continued strength of the APU platform, now representing over 70% of total mobile platform unit shipments and revenue in the quarter. We shipped over 1 million Llano APUs in the quarter and nearly 6 million Brazos APUs.

- APU platforms now represent over 40% of client units shipped, underlining strong APU adoption and reflecting the beginning of a shift in the computing industry from legacy microprocessors to a revolutionary APU architecture.

APUs have opened up significant opportunities within our customer base,

- the AMD E-series Fusion APU-based Lenovo x120e was one of the top selling commercial notebooks among distributors targeting small and medium businesses and exceeding demand forecasts.

- we continue to grow our commercial footprint as AMD-based offerings are sold to large financial institutions.

- we saw a 50% year-over-year increase in notebook designs from our top OEM partners.

**Computing Solutions operating income** was $142 million, up $42 million from the previous quarter, primarily due to improved gross margins from a richer mix of APU sales compared to the prior quarter. …

**Outlook**

The following statements concerning AMD are forward-looking, and actual results could differ materially from current expectations.

Q3 2011:

AMD expects revenue to increase 10 percent, plus or minus 2 percent, sequentially for the third quarter of 2011.

Operating expenses are expected to be approximately $625 million.

AMD has reached an inflection point with its APU strategy as evidenced by the success of APU offerings. As the Llano APU penetration continues, we expect to increasingly participate in mainstream and performance notebook market segments. We believe this opportunity positions AMD to achieve higher client ASP and gross margin, and increase our mobile microprocessor unit market share in the second half of 2011.

We expect APU shipments to exceed two-thirds of AMD's client unit shipments in the third quarter, representing nearly 100% of our mobile platform shipments.

Our new Bulldozer core for servers is expected to ship in the third quarter, and we believe will strengthen our competitive position in servers, setting the stage for unit market share recovery, as Interlagos-based platforms roll out throughout the second half of this year.

90.     During AMD's second quarter earnings conference call, on July 21, 2011, Seifert touted the Llano launch, telling the market that Llano was expected to outpace the hugely successful Brazos in terms of sales, that customer adoption was "strong," and that sell through was "excellent."  Seifert also told the market that gross margins would go up in the second half of the year due to Llanos' "margin accretiveness."  Seifert again assured the market that the Llano yield issues were in the past, stating that the Company was "receiv[ing] all the support[they] need" from GlobalFoundries, and based on that support, AMD fully expected to deliver on its increased guidance from high output and sales of Llano.

91.     Consistent with Defendants' positive statements on the Llano launch, AMD's stock increased nearly 20% from a closing price of $6.50 per share on July 21, 2011, to a closing price of $7.75 on July 22, 2011.

92.     During the next two months, Defendants repeatedly touted the adoption of Llano and strong customer demand, while denying any yield issue existed.  For example, during the August 8, 2011 Pacific Crest Securities Technology Leadership Forum, Bergman touted Llano adoption, design wins, and the "back-to-school" selling season.  He also denied that there were any issues with GlobalFoundries that would "change" the AMD "roadmap" moving forward, and that AMD was "well-positioned" with respect to GlobalFoundries.

93.     Similarly, on August 10, 2011, the Company filed with the SEC a Form 10-Q purporting to announce the Company's financial results for the six months ended July 2, 2011, and in which the Company again reported on its APU and Llano products.  The August 10, 2011 Form-10-Q stated, in pertinent part:

> During the second quarter of 2011, we continued to experience strong customer demand for our AMD Fusion family of accelerated processing unit (APU) products. In addition to increased sales of AMD Fusion C-Series and E-Series APUs, codenamed "Brazos," our first APU platform product for mobile devices, we ramped shipments of AMD Fusion A-Series APUs, codenamed "Llano," for desktop and mobile devices during the second quarter of 2011. Llano APUs that are used in platforms for mobile devices are codenamed "Sabine," and Llano APUs that are used in platforms for desktop PCs are codenamed "Lynx." As a result of strong customer adoption of the Brazos and Llano-based platforms during the second quarter of 2011, we achieved record mobile processor unit shipments and record overall microprocessor unit shipments, and AMD Fusion APU unit shipments represented over 70% of total unit shipments of microprocessors for mobile devices. The demand for Llano-based platforms by our customers exceeded the supply in the second quarter of 2011. Increased unit shipments of our APU products contributed to a richer mix of microprocessors for mobile devices, which were accretive to our second quarter 2011 gross margin. Also in May 2011, we launched an embedded AMD Fusion G-Series APU designed for compact, fanless embedded systems such as digital signage, kiosks and mobile industrial devices. In June 2011, we launched our first HD tablet platform based on the AMD Fusion Z-Series APU. With respect to graphics products, we

strengthened our product portfolio with the launch of our AMD Radeon HD 6990 GPU, designed for enthusiast mobile gamers. We also launched our newest generation of professional graphics cards – AMD FirePro V5900 and AMD FirePro V7900, which are designed to allow users to open more applications and view more information at the same time. Also, Nintendo™ announced during the second quarter of 2011 that we had been selected to provide the graphics processor for Nintendo's next generation game console system.

94. Attached to the August 10, 2011 Form 10-Q was a signed "certification" from Seifert pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, in which Seifert stated, in broad terms, that based on his knowledge the accompanying financial report did not contain any untrue statement of material fact or omit to state a material fact, and that the financial information in the report fairly represented the financial condition and results of operations of the Company. The certification further stated, again in broad terms, that the Company had the necessary internal controls to ensure that financial statements made therein were reliable.

95. On August 25, 2011, the Company announced that Rory Read was hired as CEO. During that call Seifert and Read touted APU adoption, the importance of the APU platforms to the Company's success, and the importance of the foundry (i.e., GlobalFoundries) with regard to the products that had been launched that year – namely Brazos and Llano.

96. On September 13, 2011, with only two weeks left to the 2011 third quarter, Seifert spoke at the Deutsche Bank Technology Conference, discussing what a "huge [] success[]" Llano was, and that it was doing "extremely well" in the market, attributing strength in emerging markets to Llano.

AMD BEGINS TO DISCLOSE OPERATIONAL DIFFICULTIES WITH LLANO BUT NEVERTHELESS MAINTAINS DEMAND FOR THE PRODUCT REMAINS STRONG

97. On September 28, 2011, the Company again disseminated information to investors concerning Llano, including the suggestion that there was "strong demand" for AMD products. Nevertheless, in the September 28, 2011 press release, the Company also revealed that

'manufacturing', 'yield' and 'ramp' issues at a German factory had limited the supply of Llano. The German factory was identified as the Dresden Germany GlobalFoundries factory.

98.     The September 28, 2011 press release stated, in pertinent part:

*SUNNYVALE, Calif. 9/28/2011*

AMD (NYSE:AMD) today announced that revenue for the third quarter ending Oct. 1, 2011 is expected to increase four to six percent as compared to the second quarter of 2011. The company previously forecasted third quarter 2011 revenue to increase 10 percent, plus or minus two percent, from the second quarter of 2011.

In addition, AMD expects third quarter gross margin to be approximately 44 to 45 percent. The company previously forecasted third quarter 2011 gross margin to be approximately 47 percent.

The less-than-forecasted preliminary third quarter 2011 revenue results are primarily due to 32 nanometer (nm) yield, ramp and manufacturing issues at GLOBALFOUNDRIES in its Dresden, Germany factory that limited supply of "Llano". Additionally, 45nm supply was less than expected due to complexities related to the use of common tools across both technology nodes. AMD continues to work closely with its key partner GLOBALFOUNDRIES to improve 32nm yield performance in order to satisfy strong demand for AMD products.

The less-than-forecasted preliminary third quarter 2011 gross margin results are primarily due to less-than-expected supply of "Llano" and associated products with higher average selling price (ASP). Additionally, shipments of AMD's next-generation server processor, codenamed "Interlagos," occurred later in the third quarter than originally anticipated.

99.     In other words, the yield problems associated with the 32 nanometer production had not been resolved, as AMD had previously stated, yet nevertheless, AMD continued to tout Llanos and although the September 29, 2011 press release contained negative information about production problems associated with the Llano product, the press release omitted to inform investors about the extent of operational difficulties associated with Llano. Notably, Defendants omitted that the Llano yield problems were so severe that AMD had no product to supply a major segment of its customers -- its channel distributors. When AMD failed to supply the

channel with Llano in time for the critical back-to-school season, channel vendors abandoned motherboard production for Llano and moved on to the AMD's Trinity, which was set to launch in 2012, and required a mother board that was not compatible with Llano. As a result, the Company was producing a substantial supply of Llano that the market no longer wanted.

100. As a result of the information disseminated in the September 28, 2011 press release, the trading price of AMD securities fell significantly, from a high of $6.57 per share on September 28, 2011 to a low of $5.11 per share the following day, on very heavy volume.

101. On or about October 27, 2011 the Company filed with the SEC a Form-8K containing a press release reporting the Company's third quarter 2011 financial results. As before, the Company took pains to emphasize the success of its APU business, claiming it was driving up microprocessor revenue. The October 27, 2011 press release stated, in pertinent part:

> **SUNNYVALE, Calif. – Oct. 27, 2011** – AMD (NYSE:AMD) today announced revenue for the third quarter of 2011 of $1.69 billion, net income of $97 million, or $0.13 per share, and operating income of $138 million. The company reported non-GAAP net income of $110 million, or $0.15 per share, and non-GAAP operating income of $146 million.

> "Strong adoption of AMD APUs drove a 35 percent sequential revenue increase in our mobile business," said Rory Read, AMD president and CEO. "Despite supply constraints, we saw double digit revenue and unit shipment growth in emerging markets like China and India as well as overall notebook share gains in retail at mainstream price points. Through disciplined execution and continued innovation we will look to accelerate our growth and refine our focus on lower power, emerging markets, and the cloud."

102. Accompanying the October 27, 2011 press release was a 'CFO Commentary' in which the Company acknowledged some difficulties with 32 nm production that limited the supply of Llano, but nevertheless reiterated that sales were strong due to "unanticipated sales strength in the Channel through the end of the quarter". The October 27, 2011 CFO Commentary stated, in pertinent part:

**Q3 2011 AMD Results**

**Revenue** was $1.69 billion, up 7% compared to the second quarter of 2011 and up 4% compared to the third quarter of 2010.

Revenue in the third quarter of 2011 was adversely impacted by 32 nanometer (nm) yield, ramp and manufacturing issues experienced by one of our foundry partners, that limited supply of "Llano" – our 32nm Accelerated Processing Unit (APU). Additionally, 45nm supply was less than expected due to complexities related to the use of common tools across both technology nodes.

The sequential revenue increase was driven primarily by:

Record Mobile processor revenue and unit shipments, partially offset by lower Desktop processor revenue due to lower 45nm supply, and

Seasonally higher revenue in the Graphics segment.

In addition, since our preliminary results announcement in September 2011, we saw unanticipated sales strength in the Channel through the end of the quarter.

103.    On the same day, Defendants held an earnings conference call to discuss third quarter results, Read stated that "demand was strong" and "interest in our products is significant." Seifert promised that AMD would "recover gross margin" by shipping a "higher share of Llano products" moving forward. Read also stated that customer relationships were not "irreversibly damaged" by the yield issues and assured the market that he personally met "with just about every major partner across the planet, [during the past two months] and you know, the feedback has been very consistent.  They really believe in this AMD APU…"  He also stated that there was strong uptake in APU demand for both Brazos and Llano in the channel.

104.    Read and Seifert also admitted their close attention to and awareness of the yield issue.  Read stated that we're "focused" on the yield issue "every single day."  Read personally "spent a lot of time with their executive team and they're bought in just as significantly at GLOBALFOUNDRIES as AMD to work with us and to find the right path here, and then bringing up the other key partners, like IBM and PDF as I suggested earlier.  These things are the

things that will help to lift that on a sustainable basis."  Read assured the market that they fully understood AMD's manufacturing processes with their "hands on the rudder and driving this boat," stating:

> We're making progress and we're focused on it every single day, and we're seeing progress, but again we are focused at a machine-by-machine level, step by step, and trying to improve both our sort yields, our total yields across the board.
>
> …
> I think it's unfair to kind of suggest that we don't have understanding of the root cause [of AMD's chip manufacturing difficulties]. The analysis that we're doing is machine by machine, step by step. We're making those changes as we speak and we begin - we have begun to see over the past several weeks, with this kind of intense maniacal focus on execution, that it starts - starts off improvements across that set.  So I don't want to leave anyone with a feeling that we aren't working that, understanding the issue and have our hands on the rudder and driving this boat. We have work to do, I'll for sure share that, and you know it and I know it. We have to improve our execution, but we have the experience, the expertise that's getting underneath that that we believe will drive further improvements as we go through the quarter. Thomas, do you want to add anything?

105.   Likewise, Seifert stated that the Company had "maniacal focus" on manufacturing and that AMD itself had put several teams on the yield problem:

> It's not like this is an iterative process where we don't know where we go. It's a complex situation. It takes maniacal focus, as Rory said. We've put lots of teams on this problem from our partner, from our Company, from outside, from the ecosystem, and we work hard in that direction. We see the improvement. It is the steep road, but we know the direction and we know the path.

Unbeknownst to investors, AMD was unable to provide any Llano to the channel and was allocating its available supply to top-tier OEM customers.

106.   In an AMD Form 10-Q filed with the SEC on or about November 11, 2011, the Company again acknowledged yield and other manufacturing difficulties with respect to Llano but nevertheless emphasized strong demand for the Company's APU products.   AMD also

emphasized a re-structuring of the manufacturing process to "obtain additional Llano products" in the fourth quarter 2011. The November 11, 2011 Form 10-Q stated, in pertinent part:

> We continued to experience strong customer demand for our AMD Fusion family of accelerated processing unit (APU) products during the third quarter of 2011. As a result, over 90% of the processors for mobile devices that we shipped in the third quarter of 2011 consisted of APU products. We made progress towards improving our competitive position in our server business by commencing revenue shipments of our AMD Opteron TM 6200 Series server processors, code named Interlagos, at the end of the third quarter of 2011.

> We also experienced challenges during the third quarter of 2011, particularly related to supply shortages of certain microprocessor products manufactured using the 32nm and 45nm technology nodes, which adversely impacted our ability to fulfill customer demand. Specifically, GLOBALFOUNDRIES Inc. (GF) experienced yield and other manufacturing difficulties related to 32nm wafer fabrication, resulting in lower than expected supply of AMD Fusion A-series APUs, codenamed Llano, to us. We also experienced supply constraints for our 45nm microprocessor products due to complexities related to the use of common tools across both the 32nm and 45nm technology nodes and because we made the decision to shift volume away from products manufactured using the 45nm technology node in order to obtain additional Llano products. We continue to work closely with our foundry partner to improve yields. However, we expect that during the fourth quarter of 2011, we will continue to shift volume away from products manufactured using the 45nm technology node in order to obtain additional Llano products, and therefore, we expect that we will continue to experience some supply constraints for our 45nm microprocessor products during the fourth quarter of 2011, which would have an unfavorable impact on gross margin.

107. In addition, the November 11, 2011 Form 10-Q shed further light on the relationship between AMD and GlobalFoundries, making clear that the price paid for 32nm wafers was based upon the quality and volume of the wafers, including the "manufacturing yield," stating in pertinent part:

> On April 2, 2011, we amended the Wafer Supply Agreement (WSA) with GF. Pursuant to the WSA, we currently purchase all of our microprocessor unit product requirements from GF, except APUs used in the Brazos platform. The primary effect of the amendment was to change the pricing methodology applicable to wafers delivered in 2011 for our microprocessor, including APU, products. The amendment also modified

our existing commitments regarding the production of certain graphics processing unit (GPU) and chipset products at GF. Pursuant to the amendment, GF has committed to provide us with, and we have committed to purchase, a fixed number of 45nm and 32nm wafers per quarter in 2011. We pay GF a fixed price for 45nm wafers delivered in 2011. Our price for 32nm wafers varies based on the wafer volumes and manufacturing yield of such wafers and is based on good die. In addition, we also agreed to pay an additional quarterly amount to GF during 2012 totaling up to $430 million if GF meets specified conditions related to continued availability of 32nm capacity as of the beginning of 2012. The pricing methodology set forth in the amended WSA applied to wafer purchases during the first nine months of 2011.

108.    On December 7, 2011, at the Barclays Capital Technology Conference, Seifert touted the success of Llano, and said that AMD was able to "meet customer demand" in October and November.

AMD CONTINUES TO TOUT DEMAND FOR LLANO IN 2012

109.    On January 24, 2012, during the 4Q 2011 earnings conference call, Defendants discussed customer acceptance of and demand for the APU architecture, including in emerging markets, and the increase in Llano sales in particular.  Seifert stated that there was "absolutely" strong interest in Llano.

110.    On March 1, 2012, at the Morgan Stanley Technology, Media & Telecom Conference, Seifert said that Llano momentum was "good at this point in time," that AMD had "shipped 80% more 32-nanometer Llano-based products Q3 over Q4," and that the adoption of Llano was "allow[ing] [AMD] to replace lower gross margin discrete revenue, especially at the low-end [Brazos]" with Llano revenue.

111.    The Company continued to laud the success of Llano while simultaneously acknowledging difficulties with Llano production.  For example, in its 2012 Annual Report the Company included reassurances that the Llano product continued to draw strong customer demand.  The 2012 Annual Report stated in pertinent part

*Computing Solutions*

Computing Solutions net revenue of $5.0 billion in 2011 increased 4% compared to net revenue of $4.8 billion in 2010, primarily as a result of a 16% increase in unit shipments partially offset by an 11% decrease in average selling price. The increase in unit shipments was attributable to an increase in unit shipments of our microprocessors, including APU products for mobile devices, as well as our chipset products. Unit shipments of our microprocessors, including APU products for mobile devices increased due to strong demand for our Brazos and Llano-based APU platforms. However, the increase in unit shipments in 2011 was limited by supply constraints with respect to certain microprocessor products manufactured using the 32nm technology node. Chipset unit shipments increased primarily due to an increase in overall unit shipments of our microprocessor products. The decrease in overall average selling price was primarily attributable to a decrease in the average selling price of our microprocessors for servers due to a shift in our product mix and competitive market conditions as well as sales of our Brazos APU platforms, which have a lower average selling price than our other processor products.

…

**Overview**

In 2011, we experienced important changes in our business. First, we continued to develop and deliver differentiated products. We launched our AMD family of APU products and experienced strong customer demand, especially for our AMD E-Series and C-Series APUs designed for low-power desktop and mobile platforms, codenamed "Brazos," and our AMD A-Series APUs, codenamed "Llano," for mainstream desktop and mobile platforms. We introduced a number of competitive graphics products in 2011. In July 2011, we launched the AMD Radeon™ HD 6990M graphics processor designed for enthusiast mobile gamers. We also launched the AMD Radeon HD 7970 graphics processor in December 2011, our first graphics processor based on 28nm process technology and AMD's Graphic Core Next Technology. We also continued to focus on improving our competitive position in the server market and believe we regained momentum in the second half of 2011 with the introduction of our new multi-core AMD Opteron™ 6200 and 4200 series processors, which are based on our "Bulldozer" x86 architecture.

. . .

However, our progress during 2011 was tempered by supply constraints related to our 32nm microprocessor products. We took steps during the course of the year to better manage our relationships with our third-party wafer foundries, and during the second half of 2011, 32nm yields and performance have improved.

AMD omitted that as a result of the yield problems, it had not even begun shipping Llano to the channel until December 2011, six months after the product was launched, causing the Company to miss out on channel sales for the lucrative back-to-school and holiday selling seasons entirely.

When Llano was finally made available to channel distributors, demand was weak. As a result of AMD's failure to timely supply the channel, component part vendors stopped producing parts, namely motherboards, that were compatible with Llano and which were required to integrate Llano into any computer. By the time Llano was available to the channel, vendors had moved on from Llano and were instead focused on AMD's next generation 32nm APU "Trinity" which was set to launch in mid to late 2012, and which required a motherboard with a different "chip set" than was required for Llano. As a result, excess volumes of Llano caused inventories to skyrocket to the highest levels it had been in years.

112. Similarly, on April 19, 2012, the Company filed with the SEC a Form 8-K containing a press release reporting the Company's first quarter 2012 financial results which again touted the success of the Company's Llano product and APUs. The April 19, 2012 press release stated, in pertinent part:

**SUNNYVALE, Calif. – April 19, 2012** – AMD (NYSE:AMD) today announced revenue for the first quarter of 2012 of $1.59 billion, net loss of $590 million, or $0.80 per share, and operating loss of $580 million. The company reported non-GAAP net income of $92 million, or $0.12 per share, and non-GAAP operating income of $138 million. First quarter non-GAAP net income excludes: the previously disclosed charge of $703 million for a limited waiver of exclusivity of certain 28 nanometer (nm) APU products from GLOBALFOUNDRIES Inc.(GF) related to the 2012 Amendment to the Wafer Supply Agreement; amortization of acquired intangible assets of $1 million; a restructuring charge of $8 million; SeaMicro, Inc. (SeaMicro) acquisition costs of $6 million, and a tax benefit related to the SeaMicro acquisition of $36 million.

"AMD delivered solid results in the first quarter as we remain focused on improving our execution, delivering innovative products, and building a company around a strategy to deliver strong cash flow and earnings growth," said Rory Read, AMD president and CEO. "A complete top-to-bottom introduction of new APU offerings, combined with ample product supply resulting from continued progress with our manufacturing partners, positions us to win and grow."

113.     The April 19, 2012 press release was accompanied by a 'CFO Commentary' that similarly lauded the Company's Llano product, stating:

> Llano is driving APU adoption in top-selling notebook SKUs in North America priced above $400.

114.     In the Company's 1Q 2012 earnings conference call on April 19, 2012, Seifert stated that the there was "higher than anticipated demand for certain 32-nanometer Llano products, particularly in emerging markets."  Read stated that he didn't see any significant issues in the desktop field (which was Llano's purview) due to the yield issues from 2011.  Read also stated that despite Trinity's impending launch, he did not see anything "in terms of [customer's] pause or concern" for sales related to Llano.

115.     On May 9, 2012, the Company filed with the SEC a Form 10-Q in which the Company reported its first quarter 2012 financial results.  In the May 9, 2012 Form 10-Q the Company touted the success of Llano stating that "Unit shipments of our microprocessors for mobile devices increased due to strong demand for our Brazos and Llano-based APU platforms."

## THE TRUTH BEGINS TO EMERGE

116.     By the summer of 2012 AMD was struggling to suppress evidence that demand for Llano was in fact weak, and that processing difficulties had in fact massively impacted sales of Llano.  On July 9, 2012, the Company issued a press release revealing that "channel sales" in China and Europe had lowered anticipated revenues for the quarter.  The July 9, 2012 press release stated in pertinent part:

> **SUNNYVALE, Calif.** - *7/9/2012*
> AMD (NYSE:AMD) today announced that revenue for the second quarter ended June 30, 2012 is expected to decrease approximately 11 percent sequentially.  The company previously forecasted second quarter 2012 revenue to increase 3 percent, plus or minus 3 percent sequentially.  The lower preliminary revenue results are primarily due to business conditions that materialized late in the second quarter, specifically softer-than-expected channel sales in China and Europe as well as a weaker consumer

buying environment impacting the company's Original Equipment Manufacturer (OEM) business.

The company expects second quarter gross margin to be approximately in line with prior guidance. Operating expenses for the second quarter are expected to improve and to be approximately 8 percent less than prior guidance of approximately $605 million, a result of tightly controlled expenses in the quarter.

117. In response to this news, AMD's stock price fell more than 11%, on heavy volume, to close at $4.99 per share on July 10, 2012.

118. On July 19, 2012, AMD hosted an earnings conference call to discuss the Company's 2Q 2012 financial results. During the call, AMD executives, including defendant Su revealed that far from being the game changing, high demand product touted by the Company, Llano was in fact suffering from long-standing operational difficulties, including low demand beginning in 2011, a distribution process that had been tilted away from the 'channel' partners, and a long-standing problem with 'channel' customers being able to integrate the Llano product. The AMD July 19, 2012 earnings call transcript reads as follows, in pertinent part:

**Rory P. Read** - Chief Executive Officer, President, Interim Chief Sales Officer and Member of The Board of Directors

Thank you, Ruth. Clearly, our performance in the quarter was disappointing and did not meet our commitments. When I joined AMD last year, we laid out a set of priorities to improve our execution and transform the company to sustain our long-term growth potential. This has not changed. In spite of the setback in the quarter, we continue to move forward confidently and we are taking the right steps to strengthen and transform our business.

For the second quarter, our revenue of $1.41 billion decreased 10% from a year ago and 11% sequentially, missing our expectations. After a reasonable start, we saw business velocity slow in the later part of the quarter driving this revenue miss. This second quarter revenue shortfall was largely driven by 2 key factors: first, weak sales of desktop processors in the channel, primarily in China and Europe; and secondly, a soft consumer PC market that impacted OEM notebook processor sales. We reacted quickly to this revenue softness by focusing on maintaining margin and effectively managing our expense position. As a result, we

reduced expenses sequentially and maintained margin at approximately 46%, generating a net income of $37 million in the quarter.

…

Looking at the specifics of the desktop business, sales to OEMs increased sequentially based on their continued adoption of APUs. However, our desktop channel revenue declined simply as our Llano product did not experience the same uptake it had with our OEM customers. Looking back, when we were significantly 32-nanometer supply constrained last year, we prioritized shipments of Llano to our OEM customers. As a result, channel partners saw a dramatic change in supply linearity and a misalignment with motherboard availability. This clearly impacted Llano sales and built inventory in the channel.

Correcting our channel challenges with Llano is largely within our own control. Moving forward, we will focus on accelerating desktop channel sell-through, ensure proper supply linearity and more effectively position Llano's value proposition in this area. It is clear that the overall PC market experienced softness in the second quarter, particularly in the consumer space. This impacted our notebook processor business. As the slowdown accelerated late in the quarter, OEMs responded quickly in an effort to reduce their inventory exposure at retailers and limit their on-hand inventories. We made the decision to protect our notebook margin and not chase lower margin business as the environment weakened at the end of the quarter.

…

**Rory P. Read** - Chief Executive Officer, President, Interim Chief Sales Officer and Member of The Board of Directors

Sure, Hans. From a standpoint, this originated back in last year when we had that first Llano supply chain issue. And of course, you know, Hans, that we had to target our supply to our OEMs, and that was the right thing to do. As we introduced Llano late in the year to the channel that those motherboards had been there for some period of time and really damaged linearity, and pricing wasn't at the right levels as we exited the year. As we moved forward into 2012, the uptake on Llano in the channel wasn't as strong as we expected. And what we're doing here moving forward, Hans, is we're focused on improving and focusing on sellout activity throughout the tiers of the channel, improving the communication of our value proposition into this key segment and to make sure that we make -- deliver on this momentum in the desktop channel around linearity with our channel partners. Does that help, Hans?

**Hans C. Mosesmann** - Raymond James & Associates, Inc., Research Division

Yes. Just to confirm, so the uptake in the channel was due to a sudden availability of Llano, or had the motherboards been already kind of designed for another processor?

**Rory P. Read** - Chief Executive Officer, President, Interim Chief Sales Officer and Member of The Board of Directors

No, the mismatch occurred early in the cycle as we went through this in terms of they were introduced to the channel earlier in the cycle. Then as the Llano product came in late in the year of 2012 [2011 - Rory Read misspoke when he referred to late 2012 because the conference call occurred in the July 2012. Rory Read meant to say "late in the year 2011"], there was a mismatch in terms of the pricing, et cetera. This impacted linearity. And then we didn't enjoy the same uptake that we saw around Llano that we saw with our OEMs.

…

**Lisa T. Su** - Senior Vice President and General Manager of Global Business Unit

Yes, let me make a couple comments on that. So Llano is a good product. If you look at where we're selling, it's selling into both notebook and desktop OEMs as well as the channel. We got ourselves a bit out of position admittedly and that's a big reason for our shortfall. But when we look forward, it's really the focus on sellout velocity and getting the overall positioning correct with both the CPUs as well as the motherboards. And we think we're doing that. Trinity will also be an excellent product that will go into the channel and I think we will run with both products for some time in the channel.

119.    The comments attributable to defendant Su in the July 19, 2012 AMD earnings conference call are misleading.  Llano was not close to reaching "sellout velocity", indeed inventory had increased to $833 million, up from $248 million in the prior quarter, and within a few months of the call AMD had written off $100 million of Llano related inventory.  What is clear from defendant Su's comments identified above is that Llano was being cannibalized by AMD's new Trinity product, which would further hasten Llano's demise.

120. Likewise, Read's comments about the "channel challenges with Llano" and AMD's ability to "correct" them being "largely within our control" are misleading. In fact, the problem was not fixable due to the one-year lifecycle for a microprocessor like Llano and that by the time AMD was able to supply the channel with product, the industry had moved on from Llano and was focused on AMD's next generation Trinity processor.

121. Even after the Company admitted that the revenue loss was due to the channel's failure to adopt Llano, however, Defendants continued to lead the market to believe that the Company would sell through Llano inventory and the impending Trinity launch would not destroy Llano sales. Read stated during the 2Q 2012 earnings conference call: "Moving forward, we will focus on accelerating desktop channel sell-through and share proper supply linearity and more effectively position Llano's value proposition in this area."

122. Following the July 19, 2012 news, the trading price of AMD shares fell dramatically from a high of $5.07 per share to a low of $4.20 per share on July 20, 2012.

123. At the Citi Technology Conference on September 4, 2012, Read admitted that they "saw [the channel problem] begin to manifest itself as you dissect the problem back in last summer." Read also indicated the channel was not provided with any "real" Llano product until December 2011. Read admitted to being intimately involved in the sales process in the channel in particular, stating on September 4, 2012, that he "took over sales in February [2012]…focus[ing] on getting the data and information to really dissect what is going on in the channel, what is going on in the marketplace."

124. On October 11, 2012, the Company issued a press release which included the news that "weaker than expected demand across all product lines" had caused lower than anticipated preliminary revenue results, and that AMD's gross margins would be significantly lower than expected due to an inventory write-down of approximately $100 million "due to

lower than anticipated future demand for certain products." The "certain products" would subsequently be revealed as Llano. The October 11, 2012 press release stated, in pertinent part:

> **SUNNYVALE, Calif. -- 10/11/2012**
>
> AMD (NYSE:AMD) today announced that revenue for the third quarter ended September 29, 2012 is expected to decrease approximately 10 percent sequentially. The company previously forecasted third quarter 2012 revenue to decrease 1 percent, plus or minus 3 percent, sequentially. The lower than anticipated preliminary revenue results are primarily due to weaker than expected demand across all product lines caused by the challenging macroeconomic environment.
>
> The company now expects third quarter gross margin to be approximately 31 percent; less than the previous expectation of approximately 44 percent primarily due to an inventory write-down of approximately $100 million due to lower anticipated future demand for certain products. Third quarter gross margin was also negatively impacted by weaker than expected demand, which contributed to lower than anticipated average selling prices (ASPs) for the company's Computing Solutions Group products and lower than expected utilization of its back-end manufacturing facilities.
>
> Operating expenses for the third quarter are expected to decline approximately 7 percent sequentially as a result of tightly controlled expenses in the quarter.

125. On this news, the price of AMD stock declined more than 14%, or $0.46 per share, on heavy volume, to close at $2.74 per share on October 12, 2012.

126. On October 18, 2012, the Company filed with the SEC a Form 8-K containing a press release reporting AMD's third quarter 2012 financial results. The October 18, 2012 press release revealed that far from the operational success the Company had portrayed, Llano was the cause of the $100 million write-down in inventory. In other words, Llano was unsellable. The October 18, 2012 Form 8-K stated, in pertinent part:

> Gross margin decreased sequentially due to an inventory write-down of approximately $100 million primarily consisting of first generation A-Series Accelerated Processor Units (APUs) ("Llano"), weaker-than-expected demand, which contributed to lower average selling prices (ASPs) for the company's microprocessor products and lower utilization of the company's back-end manufacturing facilities.

127.    The 'CFO Commentary' accompanying the October 18, 2012 Form 8-K reiterated that the cause of the $100 million write-down was lower demand for Llano, stating in pertinent part:

> **Gross margin** was 31% primarily due to an inventory write-down of approximately $100 million due to lower than anticipated future demand for certain products. The write-down was comprised mainly of first generation A-Series APU products ("Llano") which adversely impacted gross margin by approximately 8 percentage points. Third quarter gross margin was also negatively impacted by weaker than expected demand, which contributed to lower ASPs for the company's microprocessor products and lower utilization of back-end manufacturing facilities.

128.    Tellingly, the October 18, 2012 CFO Commentary revealed that shipments of AMD's "2nd Generation A-Series APU", code-named Trinity, had almost doubled in the quarter and represented a significant percentage of "notebook shipments."  In other words, Trinity was cannibalizing Llano.

129.    During the 3Q 2011 earnings conference call, on October 18, 2012, AMD finally admitted what it had known all along; channel demand was just not there for Llano.  Defendants also admitted that the write down, and the marked decrease in 3Q gross margins, was due to the product transition between the waning Llano and the next generation Trinity.  Signaling the "end" of the Llano APU life cycle, AMD admitted that the Company would not even try to sell off the Llano product, and took the write down instead.

130.    Following the news disseminated by the Company on October 18, 2012, the trading price of the Company's stock fell from a high of $2.78 per share on October 18, 2012 to a low of $2.17 per share on October 19, 2012.

131.    It is clear from the aforementioned press releases, SEC filings and Company conference calls that the Company disseminated false and misleading information about Llano during the Relevant Time Period.  In particular the Company falsely stated that demand for

Llano was strong, when in fact, as was known to Company executives, sales of Llano had been plagued by production problems, demand had been weak, sales of Llano to the channel had been disfavored, and the Company's Trinity product had quickly cannibalized the Llano market. All of this was known to AMD throughout the Relevant Time Period. As described above Company executives admitted as much in AMD conference calls. Further, given the short life-cycle of microprocessor products, and the complexities involved in having microprocessor products integrated into customer products, it is evident that senior AMD executives were aware of the extent of the difficulties facing AMD in selling Llano.

VIOLATIONS OF GAAP

132. The failure of Board members to ensure disclosure of material information regarding Llano means a significant number of public statements about the Company's operations were materially incomplete, in violation of federal rules and regulations governing corporate disclosures and in violation of United States' 'Generally Acceptable Accounting Provisions' ("GAAP"). GAAP are those accounting principles recognized in the accounting profession as appropriate in the United States. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading and accurate.

133. The Company's reported financial statements, as identified above, were in violation of GAAP and at least the following principles:

> a. FASB Statements of Concepts No. 1, 34. (the principle that financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions);

b.    FASB Statements of Concepts No 1, 40. (the principle that financial reporting should provide information about the economic resources of a company, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources);

c.    FASB Statements of Concepts No 1, 50. (the principle that financial reporting should provide information about how management of a company has discharged its stewardship responsibility to owners (stockholders) for the use of a company's resources entrusted to it);

d.    FASB Statements of Concepts No 2, 58-59. (the principle that financial reporting should be reliable in that it represents what it purports to represent);

e.    FASB Statements of Concepts No 2, 79. (the principle that completeness); and

f.    FASB Statements of Concepts No 2, 95. (the principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered).

134.    Here, it readily apparent that the Company violated its disclosure obligations pursuant to the GAAP measures identified above and therefore Board members failed to implement internal corporate controls necessary for the Company to meet its disclosure obligations.

VIOLATIONS OF THE AMD CORPORATE GOVERNANCE DOCUMENTS

135.    The failure of Board to disclose the extent of the operational and production difficulties faced by AMD in selling Llano violated the Company's own AMD Corporate Governance Documents, as described above.

136. During the Relevant Time Period, AMD has repeatedly filed with the SEC annual proxy statements. The annual proxy statements were filed on the following dates: March 15, 2012 (the "March 15, 2012 Proxy Statement"); March 25, 2013; (the "March 25, 2013 Proxy Statement"); March 25, 2014 (the "March 25, 2014 Proxy Statement"); and March 12, 2015 (the "March 12, 2015 Proxy Statement"), collectively referred to as the "AMD Proxy Statements."

137. The March 15, 2012 Proxy Statement stated, in pertinent part:

**AUDIT AND FINANCE COMMITTEE REPORT**

The Audit and Finance Committee of the Board of Directors consists of Dr. Barnes, as Chair, Mr. Chow and Mr. Palmer. Each of the members of the Audit and Finance Committee is "independent," and "financially literate," as determined by the Board of Directors and in compliance with NYSE and SEC rules. In addition, Dr. Barnes was designated an "audit committee financial expert," as the Board interprets that designation.

The Audit and Finance Committee oversees our internal audit function and independent registered public accounting firm and assists the Board in fulfilling its oversight responsibilities on matters relating to the integrity of AMD's financial statements, AMD's compliance with legal and regulatory requirements, the performance of our internal audit function and the independent registered public accounting firm's qualifications, independence and performance by meeting regularly with the independent registered public accounting firm, our senior management and our internal audit, financial, and legal personnel. Management is responsible for the preparation, presentation and integrity of AMD's financial statements. The independent registered public accounting firm is responsible for performing an audit of AMD's annual financial statements and expressing an opinion as to the conformity of AMD's audited financial statements with U.S. generally accepted accounting principles.

In fulfilling its oversight responsibilities, the Audit and Finance Committee reviewed and discussed AMD's audited financial statements for the fiscal year ended December 31, 2011 with management and Ernst & Young LLP, AMD's independent registered public accounting firm. The Audit and Finance Committee also discussed with Ernst & Young LLP the matters required to be discussed by Statement on Auditing Standards No. 61, as amended, as adopted by the Public Company Accounting Oversight Board (PCAOB) in Rule 3200T. This included a discussion of the independent registered public accounting firm's

judgments as to the quality, not just the acceptability, of AMD's accounting principles and such other matters that generally accepted auditing standards require to be discussed with the Audit and Finance Committee. The Audit and Finance Committee also received the written disclosures and the letter from Ernst & Young LLP required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the audit committee concerning independence, and the Audit Committee discussed the independence of Ernst & Young LLP with that firm.

Based on the Audit and Finance Committee's review and discussions noted above, the Audit and Finance Committee recommended to the Board, and the Board approved, that the audited financial statements be included in AMD's Annual Report on Form 10-K for the fiscal year ended December 31, 2011 for filing with the SEC.

The Audit and Finance Committee and the Board also have recommended, subject to stockholder ratification, the selection of Ernst & Young LLP as AMD's independent registered public accounting firm for fiscal 2012.

AUDIT AND FINANCE COMMITTEE
February 9, 2012
W. Michael Barnes, Chair
Henry WK Chow
Robert B. Palmer

138.    The March 25, 2013 Proxy Statement stated in pertinent part:

**AUDIT AND FINANCE COMMITTEE REPORT**

The Audit and Finance Committee of the Board of Directors consists of Dr. Barnes, as Chair, Mr. Chow, Mr. Harding and Mr. Palmer. Each of the members of the Audit and Finance Committee is "independent," and "financially literate," as determined by the Board of Directors and in compliance with NYSE and SEC rules. In addition, Dr. Barnes was designated an "audit committee financial expert," as the Board interprets that designation.

The Audit and Finance Committee oversees our internal audit function and independent registered public accounting firm and assists the Board in fulfilling its oversight responsibilities on matters relating to the integrity of AMD's financial statements, AMD's compliance with legal and regulatory requirements, the performance of our internal audit function and the independent registered public accounting firm's qualifications, independence and performance by meeting regularly with the independent registered public accounting firm, our senior management and our internal audit, financial, and legal personnel. Management is

responsible for the preparation, presentation and integrity of AMD's financial statements. The independent registered public accounting firm is responsible for performing an audit of AMD's annual financial statements and expressing an opinion as to the conformity of AMD's audited financial statements with U.S. generally accepted accounting principles.

In fulfilling its oversight responsibilities, the Audit and Finance Committee reviewed and discussed AMD's audited financial statements for the fiscal year ended December 29, 2012 with management and Ernst & Young LLP, AMD's independent registered public accounting firm. The Audit and Finance Committee also discussed with Ernst & Young LLP the matters required to be discussed by Public Company Accounting Oversight Board Auditing Standard No. 16. This included a discussion of the independent registered public accounting firm's judgments as to the quality, not just the acceptability, of AMD's accounting principles and such other matters that generally accepted auditing standards require to be discussed with the Audit and Finance Committee. The Audit and Finance Committee also received the written disclosures and the letter from Ernst & Young LLP required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the audit committee concerning independence, and the Audit Committee discussed the independence of Ernst & Young LLP with that firm.

Based on the Audit and Finance Committee's review and discussions noted above, the Audit and Finance Committee recommended to the Board, and the Board approved, that the audited financial statements be included in AMD's Annual Report on Form 10-K for the fiscal year ended December 29, 2012 for filing with the SEC.

The Audit and Finance Committee and the Board also have recommended, subject to stockholder ratification, the selection of Ernst & Young LLP as AMD's independent registered public accounting firm for fiscal 2013.

AUDIT AND FINANCE COMMITTEE
February 6, 2013
W. Michael Barnes, Chair
Henry WK Chow
John R. Harding
Robert B. Palmer

139. The March 25, 2014 Proxy Statement stated, in pertinent part:

**AUDIT AND FINANCE COMMITTEE REPORT**

The Audit and Finance Committee of the Board consists of Dr. Barnes, as Chair, Mr. Chow and Mr. Harding. Each of the members of the

Audit and Finance Committee is "independent" and "financially literate," as determined by the Board and in compliance with NYSE and SEC rules. In addition, Dr. Barnes was determined to be an "audit committee financial expert," as that term is defined under SEC rules.

The Audit and Finance Committee oversees our internal audit function and independent registered public accounting firm and assists the Board in fulfilling its oversight responsibilities on matters relating to the integrity of AMD's financial statements and AMD's internal controls over financial reporting, AMD's compliance with legal and regulatory requirements, the performance of our internal audit function and the independent registered public accounting firm's qualifications, independence and performance by meeting regularly with the independent registered public accounting firm, our senior management and our internal audit, financial, and legal personnel. Management is responsible for the preparation, presentation and integrity of AMD's financial statements and internal controls. The independent registered public accounting firm is responsible for performing an audit of AMD's annual financial statements and of the effectiveness of AMD's internal controls over financial reporting, and expressing an opinion on both in accordance with the Standards of the Public Company Accounting Oversight Board (United States).

In fulfilling its oversight responsibilities, the Audit and Finance Committee reviewed and discussed AMD's audited financial statements for the fiscal year ended December 28, 2013 with management and Ernst & Young LLP, AMD's independent registered public accounting firm. The Audit and Finance Committee also discussed with Ernst & Young LLP the matters required to be discussed by Public Company Accounting Oversight Board Auditing Standard No. 16. This included a discussion of the independent registered public accounting firm's judgments as to the quality, not just the acceptability, of AMD's accounting principles and such other matters that generally accepted auditing standards require to be discussed with the Audit and Finance Committee. The Audit and Finance Committee also received the written disclosures and the letter from Ernst & Young LLP required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the audit committee concerning independence, and the Audit Committee discussed the independence of Ernst & Young LLP with that firm.

Based on the Audit and Finance Committee's review and discussions noted above, the Audit and Finance Committee recommended to the Board, and the Board approved, that the audited financial statements be included in AMD's Annual Report on Form 10-K for the fiscal year ended December 28, 2013 for filing with the SEC.

The Audit and Finance Committee and the Board also have recommended, subject to stockholder ratification, the selection of Ernst &

Young LLP as AMD's independent registered public accounting firm for fiscal 2014.

> AUDIT AND FINANCE COMMITTEE
> February 5, 2014
> W. Michael Barnes, Chair
> Henry WK Chow
> John R. Harding

140. The March 12, 2015 Statement Proxy stated in pertinent part:

### AUDIT AND FINANCE COMMITTEE REPORT

The Audit and Finance Committee of the Board consists of Dr. Barnes, as Chair, and Messrs. Chow, Householder and Inglis. Each of the members of the Audit and Finance Committee is "independent" and "financially literate," as determined by the Board and in compliance with SEC and Nasdaq rules. In addition, Dr. Barnes was determined to be an "audit committee financial expert," as that term is defined under SEC rules.

The Audit and Finance Committee oversees our internal audit function and independent registered public accounting firm and assists the Board in fulfilling its oversight responsibilities on matters relating to the integrity of AMD's financial statements and the effectiveness of AMD's internal control over financial reporting, AMD's compliance with legal and regulatory requirements, the performance of our internal audit function and the independent registered public accounting firm's qualifications, independence and performance by meeting regularly with the independent registered public accounting firm, our senior management and our internal audit, financial, and legal personnel. Management is responsible for the preparation, presentation and integrity of AMD's financial statements and maintaining effective internal control over financial reporting. The independent registered public accounting firm is responsible for performing an audit of AMD's annual financial statements and of the effectiveness of AMD's internal control over financial reporting, and expressing opinions on both in accordance with the standards of the Public Company Accounting Oversight Board (United States).

In fulfilling its oversight responsibilities, the Audit and Finance Committee reviewed and discussed AMD's audited financial statements for the fiscal year ended December 27, 2014 with management and Ernst & Young LLP, AMD's independent registered public accounting firm. The Audit and Finance Committee also discussed with Ernst & Young LLP the matters required to be discussed by Public Company Accounting Oversight Board Auditing Standard No. 16. This included a discussion of

the independent registered public accounting firm's judgments as to the quality, not just the acceptability, of AMD's accounting principles and such other matters that generally accepted auditing standards require to be discussed with the Audit and Finance Committee. The Audit and Finance Committee also received the written disclosures and the letter from Ernst & Young LLP required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the audit committee concerning independence, and the Audit Committee discussed the independence of Ernst & Young LLP with that firm.

Based on the Audit and Finance Committee's review and discussions noted above, the Audit and Finance Committee recommended to the Board, and the Board approved, that the audited financial statements be included in AMD's Annual Report on Form 10-K for the fiscal year ended December 27, 2014 for filing with the SEC.

The Audit and Finance Committee and the Board also have recommended, subject to stockholder ratification, the selection of Ernst & Young LLP as AMD's independent registered public accounting firm for fiscal 2015.

AUDIT AND FINANCE COMMITTEE
W. Michael Barnes, Chair
Henry WK Chow
Joseph A. Householder
Michael J. Inglis

141. In each of the AMD Proxy Statements the relevant Audit and Finance Committee Report failed to reveal the weaknesses in AMD's internal controls that led to the dissemination of the misstatements and material omissions as described in detail herein. The Individual Defendants knew or reasonably should have known of these misstatements and omissions and yet failed to prevent or correct them from being disseminated.

EXPOSURE TO THE FEDERAL SECURITIES LAWSUIT

142. The aforementioned failures of Board members has exposed the Company to liability in the amount of $29,500,000 as a result of the Federal Securities Lawsuit in which it is alleged that the Company violated federal securities laws in issuing misleading statements to the market. The Federal Securities Lawsuit has been preliminarily approved and the hearing for final approval has been set for February 27, 2018. Defendants in the Federal Securities Lawsuit

include defendant Su who served as the Company's Senior Vice President and General Manager of Global Business Unit. The failure of Board members to ensure the Company disseminated accurate information to the Company's investors has therefore exposed the Company to significant risk and damages in the form of the Federal Securities Lawsuit.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

143. Plaintiff brings this action derivatively in the right and for the benefit of AMD to redress injuries suffered, and to be suffered, by AMD as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. AMD is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

144. Plaintiff will adequately and fairly represent the interests of AMD and its shareholders in enforcing and prosecuting its rights.

145. Plaintiff is the owner of AMD common stock and was the owner of AMD common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

146. At the time that this action was commenced, the Board consisted of the named Individual Defendants against who pre-suit demand futility should be considered.

147. As a result of the facts set forth herein, Plaintiff did not make any demand on the AMD Board to institute this action against the Individual Defendants. Such a demand would have been a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

(a)     There is reason to doubt that all Board members have complied with their fiduciary duties, thereby excusing demand.  The entire Board has demonstrated an inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors for the violations of law complained of herein.  As alleged herein, the Company has actively failed to establish or enforce internal policies to inform shareholders about the misstatements and omissions relating to Llano, including before asking shareholders to elect Board members, therefore, no reasonable AMD stockholder would believe that a majority of the members of the Board would be able to independently and properly consider a demand in good faith and, accordingly, demand is excused;

(b)     Of the eleven-member Board, the majority are either conflicted through their employment by AMD, their status as "non-independent" directors as determined by ADM, interlocking interests board service and financial payments, business conducted with AMD,  service to AMD subsidiary companies such as Advanced Research,  Therefore, no reasonable AMD stockholder would believe that a majority of the members of the Board would be able to independently and properly consider a demand in good faith and, accordingly, demand is excused;

(c)     All the Board members are potentially liable for the wrongful conduct alleged because all the current Board members were directors during some portion of the Relevant Time Period.  Accordingly, demand is excused as against the entire Board;

(d)     Defendant Su is a named defendant in the Federal Securities Lawsuit and therefore is facing liability for the wrongful conduct alleged therein. The principal professional occupation of defendant Su is Chief Executive Officer and President of AMD.  Therefore, no reasonable AMD stockholder would

believe that Su would be able to independently and properly consider a demand in good faith and, accordingly demand is excused as against Su;

(e)     Defendant Yahia was not an independent director and in fact was a director of both AMD and GlobalFoundries, Inc.  Yahia is also the CEO of Mubadala, a company for which defendant Edelman provides services. Therefore, no reasonable AMD stockholder would believe that Yahia would be able to independently and properly consider a demand in good faith and, accordingly demand is excused as against Yahia;

(f)     Defendant Harding is a non-independent director according to AMD and thus incapable of making an unfettered determination whether to bring suit against his fellow board members;

(g)     Defendant Edelman is a non-independent director according to AMD, who provides senior advisory services to defendant Yahia's company and is incapable of making an unfettered determination whether to bring suit against his fellow board members;

(h)     Defendants Caldwell, Chow, Clafin, Donofrio, Edelman, Harding, Su, and Yahia were governing persons of AMD Advanced Research LLC, a separate private company, demonstrating interlocking interests and directorships that interferes with the independent judgment whether to bring suit;

(i)     Defendants Caldwell, Chow, Householder, and Inglis were members of the AMD Audit Committee, and therefore charged with oversight of internal controls.  As active participants on the Audit Committee, they are incapable of independently considering suit against themselves for actions they have taken;

(j)     Defendants Caldwell, Householder, Donofrio, and Denzel were members of the Corporate Governance Committee and therefore knew or should have known additional governance controls were required to prevent AMD's

exposure to material misstatements concerning Llano and yet no such action was taken; and

(k)     Each Board member, in failing to implement the internal controls necessary to properly conduct director affairs, as alleged herein, and has therefore violated the ethical goals stated in the AMD Corporate Governance Documents. Therefore, demand as against the entire Board is excused.

148.     Defendant Su has been a long-time employee of AMD and most recently has served as CEO and President of AMD. Su also sits alongside other Director defendants on the private company board of AMD Advanced Research. As a result, Su, who is identified as a non-independent director by AMD, cannot disinterestedly and independently evaluate a demand for action in connection with wrongdoing by the remaining defendants. Defendant Su, as a result of her position at AMD, knew or should have known of the Llano failure and what was being disclosed about Llano in public filings made with the SEC.

149.     Defendant Yahia was a director of both AMD and GlobalFoundries, the company manufacturing the Llano chip.  Yahia also was a governing person along with other AMD directors at AMD Advanced Research.  Yahia is also CEO of Mubadala, which employs the services of director Edelman.  Yahia was also designated by AMD as a non-independent director. As a result, Yahia cannot disinterestedly and independently evaluate a demand for action in connection with wrongdoing by the remaining defendants.  Defendant Yahia knew or should have known of Llano's failures through both his service on the AMD board (where Llano was touted as the next generation in computer chips) and from his service on the GlobalFoundries board (where the Llano chip was being manufactured).

150.     Defendant Harding was a director at AMD and considered a non-independent director by AMD.  Harding also sits alongside other Director defendants on the private company

board of AMD Advanced Research. As a result, Harding cannot disinterestedly and independently evaluate a demand for action in connection with wrongdoing by the remaining defendants. Defendant Harding knew or should have known of Llano's failures through his service on the AMD board where Llano was touted as the next generation in computer chips and the principal advancement of computer chips offered by AMD.

151. Defendant Edelman was a director at AMD and considered a non-independent director by AMD. Defendant Edelman was a director at AMD and provided senior advisory services to defendant Yahia's company. Edelman is also listed as a governing person at the private company; AMD Advanced Research. Defendant Edelman knew or should have known of Llano's failures through his service on the AMD board where Llano was touted as the next generation in computer chips and the principal advancement of computer chips offered by AMD.

152. Defendant Donofrio was a director at AMD, a member of the Corporate Governance Committee, and a governing person at the private company; AMD Advanced Research. Donofrio was also on the board of Liberty Mutual Holding Company, which conducted business with AMD. Donofrio was also a director at NACD, which received payments from AMD. Donofrio knew or should have known of Llano's failures through his service on the AMD board where Llano was touted as the next generation in computer chips and the principal advancement of computer chips offered by AMD. Further, Donofrio as a member of the Corporate Governance Committee, knew or should have known additional governance controls were required to prevent AMD's exposure to material misstatements concerning Llano.

153. Defendant Denzel was a director at AMD and a member of AMD's Corporate Governance Committee. Denzel was also a director at NACD, which received payments from AMD. Defendant Denzel knew or should have known of Llano's failures through her service on the AMD board where Llano was touted as the next generation in computer chips and the

principal advancement of computer chips offered by AMD. Further, Denzel, as a member of the Corporate Governance Committee, knew or should have known additional governance controls were required to prevent AMD's exposure to material misstatements concerning Llano.

154. Defendant Clafin was a director at AMD and a governing person at the private company; AMD Advanced Research. Defendant Clafin knew or should have known of Llano's failures through his service on the AMD board where Llano was touted as the next generation in computer chips and the principal advancement of computer chips offered by AMD.

155. Defendant Caldwell was a director at AMD, a member of the audit committee, and a governing person at the private company; AMD Advanced Research. Defendant Caldwell knew or should have known of Llano's failures through his service on the AMD board where Llano was touted as the next generation in computer chips and the principal advancement of computer chips offered by AMD. Further, by requirement of the Audit Committee charter, Caldwell was specifically charged with the responsibility of oversight of internal controls.

156. Defendant Chow was a director at AMD, a member of the Audit Committee, and a governing person at the private company; AMD Advanced Research. Defendant Chow knew or should have known of Llano's failures through his service on the AMD board where Llano was touted as the next generation in computer chips and the principal advancement of computer chips offered by AMD. Further, by requirement of the Audit Committee charter, Chow was specifically charged with the responsibility of oversight of internal controls.

157. Defendant Householder was a director at AMD, a member of the Audit Committee, and a member of the Corporate Governance Committee. Defendant Householder knew or should have known of Llano's failures through his service on the AMD board where Llano was touted as the next generation in computer chips and the principal advancement of computer chips offered by AMD. Further, by requirement of the Audit Committee charter,

Householder was specifically charged with the responsibility of oversight of internal controls. Householder, as a member of the Corporate Governance Committee, knew or should have known additional governance controls were required to prevent AMD's exposure to material misstatements concerning Llano.

158.    Defendant Inglis was a director at AMD and a member of the Audit Committee. Defendant Inglis knew or should have known of Llano's failures through his service on the AMD board where Llano was touted as the next generation in computer chips and the principal advancement of computer chips offered by AMD. Further, by requirement of the Audit Committee charter, Inglis was specifically charged with the responsibility of oversight of internal controls.

## COUNT I

### (DERIVATIVE CLAIM ON BEHALF OF THE COMPANY AGAINST ALL INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF 14(a) OF THE EXCHANGE ACT AND SEC REGULATIONS)

159.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

160.    This claim is brought under Section 14 of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9.

161.    Section 14 of the Exchange Act prohibits the solicitation of any proxy in contravention to the rules promulgated thereunder.

162.    Rule 14a-9 provides that no proxy solicitation shall be made by means of any proxy statement or other communication containing "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false and misleading."

163.    The Individual Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders which were contained in the AMD Proxy Statements which misrepresented or failed to disclose, inter alia, the facts set forth above relating to the Company's production, roll-out and distribution of Llano.  By reasons of the conduct alleged herein, each of the Individual Defendants violated Section 14(a) of the Exchange Act.  This information would have been material to the Company's shareholders in determining whether to elect or reelect directors to manage their Company.

164.    The Company has been damaged as a result of the material misrepresentation and omissions contained in the AMD Proxy Statements.

165.    Plaintiff, on behalf of the Company, thereby seeks to void the election of the Individual Defendants based upon the misleading and incomplete proxy materials.  The Court should require Defendants to distribute corrected disclosures and hold a new vote.

## COUNT II
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR FAILING TO MAINTAIN INTERNAL CONTROLS)

166.    Plaintiff incorporates by reference all the preceding and subsequent paragraphs as if fully set forth herein.

167.    As alleged herein, each of the Individual Defendants has a fiduciary duty to, among other things exercise good faith in their roles as directors of the Company and to act in the interests of the Company's shareholders.  For the reasons described above, the Individual Defendants have failed to act in the interests of the Company's shareholders by failing to implement necessary internal controls to ensure the Company disseminates accurate and complete information to the Company's shareholders and the broader investment community, including ahead of shareholder votes to elect Board members.

168.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, AMD has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

169.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

170.     Plaintiff, on behalf of AMD, has no adequate remedy at law.

## COUNT III
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACHES OF FIDUCIARY DUTY FOR FAILING TO IMPLEMENT PROPER CONTROLS AND MANAGE THE COMPANY)

171.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

172.     The Individual Defendants owed and owe AMD fiduciary obligations of good faith, fair dealing, loyalty and due care.

173.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.  As alleged herein, the Individual Defendants have failed to implement adequate internal controls to ensure implement policies and controls to ensure the dissemination of accurate information to the Company's shareholders and the broader investment community.

174.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, AMD has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

175.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

176.     Plaintiff, on behalf of AMD, has no adequate remedy at law.

**COUNT IV**
**(AGAINST ALL THE INDIVIDUAL DEFENDANTS FOR**
**ABUSE OF CONTROL)**

177.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

178.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence AMD, for which they are legally responsible.  In particular, the Individual Defendants abused their positions of authority by failing to implement internal controls necessary to the proper running of the Board in the interests of all the Company's shareholders.

179.   As a direct and proximate result of the Individual Defendants' abuse of control, AMD has sustained significant damages.

180.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

181.   Plaintiff, on behalf of AMD, has no adequate remedy at law.

**COUNT V**
**(AGAINST ALL THE INDIVIDUAL DEFENDANTS FOR**
**GROSS MISMANAGEMENT)**

182.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183.   The Individual Defendants have a duty to AMD and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of AMD.

184.   The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of AMD in a manner consistent with the duties imposed upon

them by law. By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence and candor in the management and administration of AMD's affairs and in the use and preservation of AMD's assets.

185. During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused AMD to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to AMD, thus breaching their duties to the Company. As a result, the Individual Defendants grossly mismanaged AMD.

186. As a direct and proximate result of Individual Defendants' failure to perform their fiduciary obligations, AMD has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

187. As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

188. Plaintiff, on behalf of AMD, has no adequate remedy at law.

**COUNT VI**
**(AGAINST ALL THE INDIVIDUAL DEFENDANTS FOR**
**BREACH OF FIDUCIARY DUTY FOR DISSEMINATING**
**FALSE AND MISLEADING INFORMATION)**

189. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190. As alleged in detail herein, each of the Individual Defendants has a duty to ensure that AMD disseminated accurate, truthful and complete information to its shareholders.

191. The Individual Defendants have violated their fiduciary duties of care, loyalty, and good faith by either causing or allowing the Company to disseminate materially misleading and inaccurate information to its shareholders through, inter alia, SEC filings and other public

statements and disclosures as detailed herein, and / or by failing to implement internal controls to ensure the dissemination of misleading information to shareholders does not re-occur.

192.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, AMD has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

193.     As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

194.     Plaintiff, on behalf of AMD, has no adequate remedy at law.

## JURY DEMAND

Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Awarding to AMD restitution from the Individual Defendants, and each of them, and ordering disgorgement of any and all profits, benefits and other compensation obtained by the Individual Defendants;

C.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

D.     Ordering AMD to implement enhanced corporate governance and internal control procedures including to appropriately test and then strengthen AMD's internal audit and control functions;

1

     E.    Void the election of the Individual Defendants based upon the misleading and

2 incomplete proxy materials and requiring the Individual Defendants to distribute corrected

3 disclosures and hold a new vote; and

4

     F.    Granting such other and further relief as the Court deems just and proper.

5

6 Dated: February 2, 2018

    GLANCY PRONGAY & MURRAY LLP

7

    By: *s/ Kara M. Wolke*             
    Lionel Z. Glancy

8     Kara M. Wolke

9     1925 Century Park East, Suite 2100
    Los Angeles, California 90067

10     Telephone:    (310) 201-9150
    Facsimile:    (310) 201-9160

11     Email:    lglancy@glancylaw.com
                kwolke@glancylaw.com

12

13     Matthew M. Houston
    HARWOOD FEFFER LLP

14     488 Madison Avenue, 8th Floor
    New York, New York 10022

15     Telephone:    (212) 935-7400
    Facsimile:    (212) 757-5671

16     Email:    mhouston@hfesq.com

17     Avi Wagner

18     THE WAGNER FIRM
    1925 Century Park East, Suite 2100

19     Los Angeles, CA 90067
    Telephone:    (310) 491-7949

20     Facsimile:    (310) 694-3967

21     Email:    avi@thewagnerfirm.com

22     *Attorneys for Plaintiff Jake Ha*

23

24

25

26

27

28

## VERIFICATION

I, Jake Ha, do hereby verify that I am a holder of common stock of Advanced Micro Devices, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Amended Shareholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint and all of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: 2/2/2018 _____, 2018

DocuSigned by:

_____
89DC55635E94437
Jake Ha

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On February 2, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 2, 2018, at Los Angeles, California.


*s/ Kara M. Wolke*
Kara M. Wolke

# Mailing Information for a Case 4:15-cv-04485-YGR Ha v. Caldwell et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Melanie Marilyn Blunschi**
  melanie.blunschi@lw.com,#sflitigationservices@lw.com,sf-litigation-services-4917@ecf.pacerpro.com,melanie-blunschi-5434@ecf.pacerpro.com

- **Patrick Edward Gibbs**
  pgibbs@cooley.com,bgiovannoni@cooley.com

- **Jason C. Hegt**
  jason.hegt@lw.com,jason-hegt-2094@ecf.pacerpro.com

- **Matthew Rawlinson**
  matt.rawlinson@lw.com,zoila.aurora@lw.com,matthew-rawlinson-3894@ecf.pacerpro.com,jenny.duckworth@lw.com,#SVLitigationServices@lw.com

- **Avraham Noam Wagner**
  avi@thewagnerfirm.com

- **Morgan Edwin Whitworth**
  morgan.whitworth@lw.com,#sflitigationservices@lw.com

- **Kara M Wolke**
  kwolke@glancylaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)